**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
————————————————————

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JESSICA JEAN CLARK, a/k/a Jessica
Jean Kidd,

    Defendant - Appellant.

No. 19-7046
(D.C. No. 6:18-CR-00070-RAW-1)
(E.D. Okla.)

————————————————————

**ORDER**
————————————————————

Before **BRISCOE**, **MURPHY**, and **BACHARACH**, Circuit Judges.
————————————————————

This matter is before the us on *Defendant/Appellant's Petition for Rehearing*. The petition is granted in part to the extent of the modifications on page 17 of the attached revised opinion. The court's November 17, 2020 opinion is withdrawn and replaced by the attached revised opinion, which shall be filed as of today's date. Because the panel's decision to partially grant rehearing resulted in only non-substantive changes to the opinion that do not affect the outcome of this appeal, Appellant may not file a second or successive rehearing petition. *See* 10th Cir. R. 40.3.

Entered for the Court

CHRISTOPHER M. WOLPERT, Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

JESSICA JEAN CLARK, a/k/a Jessica
Jean Kidd,

     Defendant - Appellant.

No. 19-7046

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:18-CR-00070-RAW-1)**
_____

Barbara L. Woltz, Attorney (Julia L. O'Connell, Federal Public Defender; Barry L. Derryberry and Robert S. Williams, Attorneys, with her on the briefs), Office of the Federal Public Defender for the Northern and Eastern Districts of Oklahoma, Tulsa, Oklahoma, appearing for Appellant.

Linda A. Epperley, Assistant United States Attorney (Brian J. Kuester, United States Attorney, with her on the brief), Office of the United States Attorney for the Eastern District of Oklahoma, Muskogee, Oklahoma, appearing for Appellee.
_____

Before **BRISCOE**, **MURPHY**, and **BACHARACH**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.
_____

Defendant Jessica Clark pleaded guilty to one count of child neglect in Indian

Country, in violation of 18 U.S.C. §§ 1151, 1153, and Okla. Stat. Ann. Tit. 21,

§ 843.5(C). At sentencing, the district court concluded there was no sufficiently analogous Guidelines provision that applied to Clark's offense of conviction and that, consequently, it was left to sentence Clark without reference to a specific Guidelines provision or advisory Guidelines sentencing range, as provided in 18 U.S.C. § 3553(b). The district court ultimately sentenced Clark to a term of imprisonment of 84 months, to be followed by a five-year term of supervised release.

Clark now appeals, arguing that the district court committed two procedural errors during her sentencing. First, Clark argues that U.S.S.G. § 2A2.3, the Sentencing Guidelines provision applicable to "Assault" offenses, is sufficiently analogous to her offense of conviction and therefore should have, pursuant to U.S.S.G. § 2X5.1, been applied by the district court to determine both an offense level and in turn an advisory Guidelines sentencing range. Second, Clark argues that the district court plainly erred by failing to adequately explain the reasons for the sentence it imposed. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reject Clark's first argument, but agree with her second. Consequently, we affirm the district court's conclusion that there is no sufficiently analogous Guidelines provision, but remand this matter to the district court with directions to vacate Clark's sentence and to conduct a resentencing, which shall include an explanation of the reasons for the sentence ultimately imposed.

# I

*Factual background*

Defendant Clark is a Native American and enrolled member of the Cherokee Nation tribe. At the time of the events that resulted in Clark's arrest and conviction, Clark lived with her two minor children, nine-year-old P.H. and six-year-old J.H., in a house near Stilwell, Oklahoma, and on lands held in trust by the United States government for the Cherokee Nation. Clark's sister, Evelyn Israel, and Israel's two minor children, M.I. and K.I., also resided in the house at the time of the events in question.

Clark and her family lived in dire conditions. Clark's home had broken windows and no source of running water. As a result, Clark and her children relied either on bottled water or water obtained from a nearby creek. Clark had no driver's license and no vehicle, and thus relied on others to provide transportation for her and her children. Clark was unemployed and relied on disability payments that she received on behalf of P.H., who had been diagnosed with autism and ADHD. Clark regularly used marijuana and methamphetamine.

On Friday, September 8, 2017, P.H., J.H., and their two cousins, M.I. and K.I., were playing at the creek near Clark's house. The children climbed onto a log that sat above the creek and, at some point, P.H. fell off of the log and injured her right leg. The other children helped P.H. walk back to her house.

P.H. spent the majority of the next three days lying on the couch in the living room of her home. Over the course of that period, P.H. ate very little, her injured leg

3

turned purple, and she developed a fever. On the morning of Tuesday, September 12, 2017, Israel heard P.H. scream for her. Israel went into Clark's room and observed P.H. lying on the bed. According to Israel, fluid was coming from P.H.'s groin and mouth. P.H. was carried to the living room, where she collapsed. Clark ran down the road to get help and called 911. An ambulance arrived and P.H. was transported to the Stilwell Memorial Hospital, where she was pronounced dead. An autopsy concluded that P.H.'s death was caused by "complications of deep soft tissue due to an infection of the right lower leg." ROA, Vol. 3 at 10.

Clark was interviewed by law enforcement officers after P.H.'s death. Clark described P.H. as her "healthy child," but noted that she occasionally took P.H. to the emergency room for treatment. *Id*. at 5. Clark noted that on the evening of the day that P.H. injured her leg, P.H.'s leg began swelling and she showed signs of illness. Clark stated that she intended to take P.H. to the emergency room the following day, but ended up not doing so because the following day the swelling in P.H.'s leg appeared to go down some and P.H. felt well enough to play. According to Clark, P.H. developed a fever and began vomiting on Sunday, September 10, 2017. Clark stated that several people in the household had recently had a stomach virus, and she believed that P.H. had contracted it and that was what was causing her fever and vomiting. On Monday, September 11, 2017, P.H. continued to have a fever and diarrhea. Clark stated that on the evening of September 11, P.H. ate peaches, drank ice water, and talked about wanting to go to school the next day. According to Clark, P.H. slept with her on the night of September 11, and the following morning P.H.

4

appeared to be fine at approximately 7 a.m.  Clark stated that she subsequently heard P.H. yelling for her from the bedroom, so she went into the bedroom and laid down with P.H..  Clark purportedly asked P.H. if she wanted to go to the emergency room, and P.H. said no.  At some point after 9 a.m. that morning, P.H. purportedly began yelling for Clark again, and P.H. was carried from the bedroom to the living room couch.  As she was being carried to the couch, P.H. purportedly said, "My stomach is hot," and indicated that her legs were hurting.  *Id.*  As P.H. was lying on the couch, Clark noticed that P.H.'s eyes were rolled back into her head and she was having problems breathing.  At that point, Clark ran out of the house to find cell phone service and, after doing so, called 911.  After Clark called 911, a neighbor arrived in a vehicle, and agreed to drive Clark and P.H. to meet the ambulance.  Thereafter, the ambulance took P.H. and Clark to the hospital.

Israel was also interviewed by law enforcement officers.  Israel stated that she witnessed Clark and her boyfriend, Kenneth Linville, smoking marijuana during the time period that P.H. was sick.  Further, Israel stated that she suggested to Clark, during the time period that P.H. was sick, that their mother could come and take P.H. to the hospital, but Clark refused, saying that she expected P.H. to get better.  Israel also noted that Clark owned a cell phone and was able to use it to make phone calls if she walked a very short distance from the home.

Law enforcement officials obtained records from the Oklahoma Department of Human Services which revealed approximately twenty-two referrals involving Clark and her children beginning in 1998.  Of those referrals, only two, one in 2003 and

another in 2015, were found to be substantiated. There was also an open referral at the time of P.H.'s death. The referrals included concerns about neglect related to an unsafe home, domestic violence, physical abuse, sexual abuse, substance abuse, and medical neglect. The open referral was made on September 11, 2017, and was an anonymous voicemail regarding Clark, her alleged drug use, and the dire condition of the house.

On October 6, 2017, a Cherokee Nation Child Abuse and Neglect Report was completed by Child Welfare Specialist Pam Edgar regarding allegations of neglect as to P.H. and J.H. Clark admitted to Edgar that she used marijuana and methamphetamine, and her admission was corroborated by her own medical records, which showed numerous positive urinalysis results, as well as by multiple collateral interviews. J.H. was found to have rotting teeth and Clark admitted to never having taken him to a dentist. J.H. was seen by a pediatrician and was determined to have an impacted bowel that required medical intervention to correct. Clark stated that J.H. had a history of defecating on himself, including at school, but she thought he would get better on his own. J.H. was also seen by an optometrist who determined he needed glasses; J.H. had never been to an optometrist before. Edgar concluded that both P.H. and J.H. had been exposed to domestic violence in the home. As a result of Edgar's investigation, the Cherokee Nation Indian Child Welfare department recommended that a petition be filed and that J.H. remain in the custody of the Cherokee Nation until the conditions which led to his removal were corrected.

6

*Procedural background*

On July 18, 2018, a federal grand jury returned an indictment charging Clark with one count of child neglect in Indian Country, in violation of 18 U.S.C. §§ 1151, 1153, and Okla. Stat. Ann. Tit. 21, § 843.5(C). That count alleged, in particular, that "[f]rom in or about June 17, to September 13, 2017," Clark "did willfully and maliciously fail and omit to provide adequate nurturance, hygiene, sanitation, shelter and medical care to J.H. and P.H., and provide special care made necessary by the physical condition of P.H." ROA, Vol. 1 at 12.

On October 24, 2018, Clark appeared before a magistrate judge and entered a plea of guilty to the charge alleged in the indictment.

A presentence investigation report (PSR) was initially prepared on January 31, 2019. Under the section entitled "Offense Level Computation," the PSR did not calculate an offense level for Clark. The PSR acknowledged that U.S.S.G. §§ 1B1.2(a) and 2X5.1 required "the most analogous guideline [to] be utilized" in calculating Clark's offense level. ROA, Vol. 3 at 11. The PSR concluded, however, that there was "no analogous guideline applicable to a violation of Child Neglect in Indian Country," and "therefore . . . the guideline sentence [wa]s up to life imprisonment in accordance with the statutory provisions of 18 U.S.C. §§ 1151 & 1153 and 21 Okla. Stat. 843.5(C)." *Id.*

Clark filed objections to the PSR. In pertinent part, she argued that U.S.S.G. § 1B1.2(a) required the district court to utilize the "most analogous guideline," and that "[f]ederal precedents establish[ed] that the Guidelines for assault appl[ied] in

7

child neglect or abuse cases" such as hers. *Id.* at 33. Clark in turn argued that under U.S.S.G. § 2A2.3(a)(2), her base offense level should be 4, she should receive a four-level enhancement due to the age of the victim, and she should receive a two-level reduction for acceptance of responsibility, resulting in a total offense level of 6. That offense level, combined with her criminal history category of I, she argued, would result in an advisory Guidelines sentencing range of 0-6 months.[1]

Clark subsequently filed a sentencing memorandum again arguing "that the most applicable" Guidelines provision was "the Assault guideline," and that "[a]pplying that guideline result[ed] in a 0-6 month sentencing range." ROA, Vol. 1 at 13. Clark also argued that the district court "should not apply the Involuntary Manslaughter guideline because the medical evidence show[ed] that [her] daughter died from an infection, not neglect." *Id.* Ultimately, Clark asked the district court to "[i]mpose a one-year, time served sentence." *Id.* at 25.

The government responded with its own sentencing memorandum. The government argued, in pertinent part, that Clark "pled guilty to a crime of omission, not one of commission," and that, consequently, "the guideline for Assault [wa]s not analogous to the case at bar." *Id.* at 49. The government in turn suggested that a range of "210–262 months . . . should serve as the starting point for an appropriate sentence" in this case. *Id.* at 53.

---

[1] Clark had no prior juvenile or adult criminal convictions, and thus had a total criminal history score of zero and a resulting criminal history category of I. ROA, Vol. 3 at 10 (PSR).

The district court held a three-day sentencing hearing beginning on September 24, 2019. At the conclusion of the hearing, the district court accepted Clark's guilty plea and sentenced her to a term of imprisonment of 84 months, to be followed by a five-year term of supervised release. In doing so, the district court concluded, contrary to the arguments asserted by Clark, that the PSR correctly determined that there was no analogous Guidelines provision:

> Counsel for the defendant objects to the lack of application of the most analogous guideline to provide for a guideline sentence. Counsel argues that the guideline for Assault at United States Sentencing Guidelines Section 2A2.3, or, in the alternative, the guideline for Involuntary Manslaughter at United States Sentencing Guideline Section 2A1.4 should be applied to the presentence report. * * *

> * * *

> In this case, the defendant was charged with Child Neglect in Indian Country in violation of 18 United States Code, Sections 1151 and 1153, and 21 Oklahoma Statute Section 843.5(C). Pursuant to United States Sentencing Guideline Section 2X5.1, if the -- if the offense is a felony for which no guideline expressly has been promulgated, the most analogous guideline is applied.

> However, if there's not a sufficiently analogous guideline, the provisions of 18 United States Code, Section 3553 shall control, except that any guidelines and policy statements that can be applied meaningfully in the absence of a Chapter 2 offense guideline shall remain applicable.

> In this case, there is no analogous guideline applicable to the charged offense. The defendant pled guilty to negligently omitting to provide her child with the proper care that was needed and that the child was legally entitled to receive. As such, it is a crime of omission and not commission. Since the evidence does not show that the defendant physically assaulted her children, the guideline for Assault is not sufficiently analogous to the case at bar. Similarly, pursuant to 18 United States Code, Section 1112, Involuntary Manslaughter is defined as in the commission of an unlawful act not amounting to a felony, or in

9

the commission in an unlawful manner or without due caution and circumspection of a lawful act which might produce death. [P.H.] died after the defendant committed the felony crime of Child Neglect, an unlawful act of omission. Additionally, the indictment also alleges neglect of J.H. who did not die. Therefore, Involuntary Manslaughter is also not sufficiently analogous.

Additionally, this Court has considered an elements-based approach similar to the categorical approach, and compared the elements of the offense of conviction to the elements of the offenses suggested by counsel for the defendant which are covered by the guidelines. However, the elements in this case are not sufficiently analogous to the elements of those offenses covered by the guidelines.

\* \* \*

Therefore, the Court finds that the presentence report accurately does not apply a guideline for the purposes of providing a guideline sentence. Accordingly, the defendant's objection number three is overruled.

ROA, Vol. 2 at 534–36.

Judgment in the case was entered on September 30, 2019. Clark timely appealed.

II

In her appeal, Clark argues that the district court committed two procedural errors during her sentencing. First, she argues that the district court committed reversible procedural error in "concluding that no analogous guideline existed." Aplt. Br. at 9. According to Clark, the district court should have applied "[t]he guideline applicable to assault, [U.S.S.G.] § 2A2.3," because, when comparing elements, assault is the most analogous offense to "the assimilated crime of child neglect." *Id*. Second, Clark argues that the district court committed plain error at the

10

time of sentencing by failing to provide "any indication of how [it] arrived at [the 84-month] sentence." *Id*. at 10. More specifically, Clark asserts that the district court "failed to give any explanation of how [it] applied the statutory sentencing factors to the particular facts of [her] case," "did not discuss what weight [it] gave to the mitigating evidence and arguments," "did not discuss avoiding unwarranted sentencing disparities even though [she] had asked the court to compare her confessed crime . . . to the Guidelines sentencing range for involuntary manslaughter," and "did not give any indication that [it] considered" the adjustment for acceptance of responsibility "in formulating the chosen sentence." *Id*. at 10–11.

*Standard of review*

Generally speaking, "[w]e review challenges to the procedural reasonableness of sentences for an abuse of discretion." *United States v. Worku*, 800 F.3d 1195, 1201 (10th Cir. 2015). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). A district court commits procedural error, in pertinent part, by "failing to calculate (or improperly calculating) the Guidelines range," "failing to consider the § 3553(a) factors," "or failing to adequately explain the chosen sentence." *Id*. at 51. In addition, "[a]n error of law is per se an abuse of discretion." *United States v. Sanchez-Leon*, 764 F.3d 1248, 1262 (10th Cir. 2014) (quotations omitted).

If a defendant did not raise a procedural objection at the time of sentencing, we review any such objection only for plain error. *United States v. Wireman*, 849

11

F.3d 956, 962 (10th Cir. 2017). "We will find plain error only when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotations omitted).

*Is there an analogous Guidelines provision?*

Section 1B1.2(a) of the Sentencing Guidelines directs a district court, in calculating the advisory Guidelines sentencing range for a defendant, to begin by selecting the applicable Guidelines provision, if one exists, for the offense of conviction. U.S.S.G. § 1B1.2(a); *see* U.S.S.G. § 1B1.1(a)(1). If, as is the case here, "the offense is a felony for which no guideline expressly has been promulgated" by the Sentencing Commission, a district court must "apply the most analogous offense guideline." U.S.S.G. § 2X5.1 (2016).

> The commentary to § 2X5.1 states, in pertinent part:
>
> **Background**: Many offenses, especially assimilative crimes, are not listed in the Statutory Index or in any of the lists of Statutory Provisions that follow each offense guideline. Nonetheless, the specific guidelines that have been promulgated cover the type of criminal behavior that most such offenses proscribe. The court is required to determine if there is a sufficiently analogous offense guideline, and, if so, to apply the guideline that is most analogous. In a case in which there is no sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 control.
>
> The sentencing guidelines apply to convictions under 18 U.S.C. § 13 (Assimilative Crimes Act) and 18 U.S.C. § 1153 (Indian Major Crimes Act); see 18 U.S.C. § 3551(a), as amended by section 1602 of Public Law 101-647.

*Id.* cmt. background.

12

To comply with the directives of § 2X5.1, a district court must first "determine whether *any* guideline, and there can be more than one, is sufficiently analogous to the defendant's crime of conviction."[2]  *United States v. Nichols*, 169 F.3d 1255, 1270–71 (10th Cir. 1999) (emphasis in original).  "Whether there is a sufficiently analogous guideline to a particular crime is generally a task of comparing the elements of the defendant's crime of conviction to the elements of federal offenses already covered by a specific guideline."  *Id.*  "The determination on this point is a purely legal one, and the district court need not consider the underlying factual circumstances of the defendant's case."  *Id.*  "Accordingly, we review *de novo* the district court's decision regarding the first step of the inquiry."  *Id.*  If there are two or more analogous guidelines, the district court must then "determine which of the[] [available] guidelines [is] the *most* analogous."  *Id.* at 1271 (emphasis in original).  "If no sufficiently analogous guideline exists, the [district] court is directed to sentence without reference to a specific guideline or guideline range, as provided in 18 U.S.C. § 3553(b)."  U.S.S.G. § 2X5.1 cmt.; *see* 18 U.S.C. § 3553(b)(1) ("In the absence of an applicable sentencing guideline in the case of an offense other than a

---

[2] Clark argues that "[i]f an analogous guideline is 'within the ballpark,' *see United States v. Rakes*, 510 F.3d 1280, 1287 (10th Cir. 2007), then it should be used to correctly calculate the applicable Guidelines range."  Aplt. Br. at 13.  When read in context, the "ballpark" reference in *Rakes* was referring to this first step in *Nichols*.  *See* 510 F.3d at 1287 ("Put another way, the court first had to ask what analogous provisions were within the ballpark; it then had to ask which represented the best fit.").  The district court is to first search broadly (the "ballpark") for an analogous guideline, and then narrow its search, if more than one guideline is potentially applicable, to the guideline that is most analogous.  The "ballpark" is only the beginning of the search, not the end.

13

petty offense, the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission.").

The Third Circuit, which likewise applies an elements-based approach to determining whether there is a sufficiently analogous guideline provision under § 2X5.1, has emphasized "that this inquiry must be conducted in a flexible and open-ended fashion." *United States v. Jackson*, 862 F.3d 365, 375 (3d Cir. 2017). "While the inquiry may still be bounded by the elements of the offense of conviction, a perfect match of elements is not necessary (or even expected)." *Id*. at 376 (quotations and citation omitted). "Instead, the proffered guideline need only be within the same proverbial 'ballpark' as the offense of conviction." *Id*.

To determine if a sufficiently analogous guideline exists in this case, it is necessary for us to begin by reviewing the elements of the crime of conviction. The Major Crimes Act (MCA), under which Clark was convicted, provides, in pertinent part, that "[a]ny Indian who commits against the person . . . of another Indian . . . felony child abuse or neglect . . . within the Indian country, shall be subject to the same law and penalties as all other persons committing . . . the . . . offenses, within the exclusive jurisdiction of the United States." 18 U.S.C. § 1153(a). Because federal law does not define or directly punish "felony child abuse or neglect," the MCA provides that it "shall be defined and punished in accordance with the laws of the State in which such offense was committed." *Id*. § 1153(b).

14

In this case, the MCA incorporated the laws of the State of Oklahoma, where the charged offense was committed. Oklahoma's criminal child neglect statute provides, in pertinent part:

> Any parent or other person who shall willfully or maliciously engage in child neglect shall, upon conviction, be punished by imprisonment in the custody of the Department of Corrections not exceeding life imprisonment, or by imprisonment in a county jail not exceeding one (1) year, or by a fine of not less than Five Hundred Dollars ($500.00) nor more than Five Thousand Dollars ($5,000.00), or both such fine and imprisonment. As used in this subsection, "child neglect" means the willful or malicious neglect, as defined by Section 1-1-105 of Title 10A of the Oklahoma Statutes, of a child under eighteen (18) years of age by another.

Okla. Stat. Ann. Tit. 21, § 843.5(C). Consistent with the language of the statute, the Oklahoma courts have identified the following essential elements of the crime of child neglect:

> First, a person responsible for the child's health, safety, or welfare;
>
> Second, willfully/maliciously;
>
> Third, failed/omitted to provide;
>
> Fourth, adequate (nurturance and affection)/food/clothing/shelter /sanitation/hygiene)/(appropriate education)/(medical/dental/(behavioral health) care/supervision/(appropriate caretakers)/(special care made necessary by the physical/mental condition of the child);
>
> Fifth, for a child under the age of eighteen.

Instruction No. 4-37, OUJI-CR (2d) (Supp. 2019).

Having outlined the elements of Clark's offense of conviction, we now consider potentially analogous Guidelines provisions. The district court in this case considered and ultimately rejected two possibly analogous provisions: involuntary

15

manslaughter and assault.[3]  The district court concluded that involuntary manslaughter was not sufficiently analogous.  Clark does not appeal that conclusion, and we need not decide whether we bear an independent duty to analyze potentially analogous guideline provisions beyond those pursued on appeal.  In this case, even if we had such an obligation, we would conclude, as we shall proceed to briefly explain, that involuntary manslaughter is not sufficiently analogous to child neglect under Oklahoma state law.

The "Involuntary Manslaughter" Guidelines provision, U.S.S.G. § 2A1.4, applies by its terms to three categories of criminal conduct: (1) "criminally negligent conduct," (2) "reckless conduct," and (3) "reckless operation of a means of transportation."  U.S.S.G. § 2A1.4(a)(1)–(2).  In turn, the federal manslaughter statute, 18 U.S.C. § 1112, states, in pertinent part, that "involuntary manslaughter is the unlawful killing of a human being without malice," and both "voluntary" (defined as "[u]pon a sudden quarrel or heat of passion") and "involuntary" (defined as "[i]n the commission of an unlawful act not amounting to a felony, or in the commission in

---

[3] Clark initially argued before the district court, in written objections that she filed to the PSR, that the district court should apply the assault Guidelines provision if it found that her acts or omissions were not the proximate cause of P.H.'s death, and alternatively should apply the involuntary manslaughter Guidelines provision if it found that her acts or omissions were the proximate cause of P.H.'s death.  ROA, Vol. 3 at 35.  Clark later filed a sentencing memorandum arguing that the district court "should not apply the Involuntary Manslaughter guideline because the medical evidence show[ed] that [P.H.] died from an infection, not neglect."  ROA, Vol. 1 at 13.  At the sentencing proceeding, the district court, consistent with the framework outlined in *Nichols*, considered both the assault and involuntary manslaughter provisions in its search for a potentially analogous Guidelines provision.

16

an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death").

If we were to compare the *facts* of Clark's offense to the *elements* of involuntary manslaughter, we might conclude that involuntary manslaughter is a sufficiently analogous offense. But, as previously noted, our precedent requires us to instead compare the elements of the offense of conviction to the elements of the analogous Guidelines offenses. And doing so removes involuntary manslaughter from serious consideration because the elements of involuntary manslaughter are significantly different than those of child neglect. To begin with, involuntary manslaughter, unlike child neglect, requires the killing of a human being. Although Clark's conduct in this case may have caused or at least contributed to P.H.'s death, the offense of conviction does not require any type of injury to occur to a child, let alone death. Further, the means of committing involuntary manslaughter are significantly different than the means of committing child neglect. Specifically, the child neglect statute, unlike the involuntary manslaughter statute, does not require the defendant to act upon a sudden quarrel or heat of passion, commit an unlawful act not amounting to a felony, or commit in an unlawful manner, or without due caution and circumspection, a lawful act which might produce death. We therefore agree with the district court that involuntary manslaughter is not sufficiently analogous to Clark's offense of conviction for purposes of § 2X5.1.

Clark argues, as she did below, that the most analogous guideline is the "Assault" guideline, U.S.S.G. § 2A2.3. That guideline "applies to misdemeanor

assault and battery and to any felonious assault not covered by § 2A2.2 (Aggravated Assault)." § 2A2.2 cmt. background. "Aggravated assault" is defined in the Guidelines as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony." § 2A2.2 cmt. n.1. In other words, aggravated assaults "are more serious than other assaults because of the presence of an aggravating factor, i.e., serious bodily injury; the involvement of a dangerous weapon with intent to cause bodily injury; strangling, suffocating, or attempting to strangle or suffocate; or the intent to commit another felony." § 2A2.2 cmt. background.

The federal assault statute, 18 U.S.C. § 113(a), covers a wide range of "[a]ssaults within the special maritime and territorial jurisdiction." Of most relevance here are the following three subsections:

> (5) Simple assault [i.e., offensive touching], by a fine under this title or imprisonment for not more than six months, or both, or if the victim of the assault is an individual who has not attained the age of 16 years, by fine under this title or imprisonment for not more than 1 year, or both.

> (6) Assault resulting in serious bodily injury, by a fine under this title or imprisonment for not more than ten years, or both.

> (7) Assault resulting in substantial bodily injury to a spouse or intimate partner, a dating partner, or an individual who has not attained the age of 16 years, by a fine under this title or imprisonment for not more than 5 years, or both.

18

18 U.S.C. § 113(a)(5)–(7).  The phrase "serious bodily injury" is defined to mean "bodily injury" (including "physical pain" and "illness") that involves:

> (A) a substantial risk of death;
> (B) extreme physical pain;
> (C) protracted and obvious disfigurement; or
> (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty

18 U.S.C. § 1365(h)(3); *see* 18 U.S.C. § 113(b)(2).  The phrase "substantial bodily injury" is in turn defined to mean "bodily injury" that "involves . . . (A) a temporary but substantial disfigurement; or (B) a temporary but substantial loss or impairment of the function of any bodily member, organ, or mental faculty . . . ."  18 U.S.C. § 113(b)(1).

We have held that the essential elements of assault under § 113(a)(6) include (a) the defendant committed an assault, and (b) the victim suffered serious bodily injury.  *See United States v. Zunie*, 444 F.3d 1230, 1233 (10th Cir. 2006) (citing 18 U.S.C. §§ 113(a)(6) and 1153).  We have also, for purposes of these statutory elements, "defined assault in § 113(a) 'as either an attempted battery or as placing another in reasonable apprehension of immediate bodily harm.'"  *United States v. Muskett*, 970 F.3d 1233, 1241 (10th Cir. 2020) (quoting *United States v. Hathaway*, 318 F.3d 1001, 1008 (10th Cir. 2003)).

Comparing the elements of Clark's offense of conviction to the elements of federal assault, it is apparent that there are significant differences between the two.  Most notably, the offense of child neglect does not require an affirmative act on the part of the defendant, but rather only willful or malicious neglect, i.e., the failure to

19

provide or the omission of certain essential basics of living that are necessary to a child's well-being. In contrast, the federal crime of assault requires the defendant to have either attempted to batter the victim or to have placed the victim in reasonable apprehension of immediate bodily harm. Further, aside from the crime of simple assault, the other federal assault provisions quoted above require the victim to have suffered either "substantial bodily injury" or "serious bodily injury." In contrast, the offense of child neglect that Clark was convicted of does not require the child victim to have suffered any type of injury. In short, the most similar forms of the federal offense of assault do not appear to be remotely analogous to the offense of child neglect under Oklahoma law that Clark was convicted of. Although a sufficiently analogous offense will necessarily not have the same elements as the offense of conviction, we conclude that there must be a greater degree of similarity than exists between the offense of child neglect under Oklahoma law and the federal offense of assault.

Clark, for her part, points to the Third Circuit's decision in *Jackson*. The defendants in *Jackson*, a United States Army officer and his wife, "were convicted of conspiracy to endanger the welfare of a child and endangering the welfare of a child under New Jersey law—offenses that were 'assimilated' into federal law pursuant to the Assimilative Crimes Act" (ACA) because they occurred on a military base located in New Jersey. 862 F.3d at 368. According to the indictment that was returned in that case, the defendants carried out the conspiracy offense, in pertinent part, by "physically assaulting [their three foster] children," one of whom died, "with

20

various objects and with their hands, withholding proper medical care (and failing to seek prompt medical attention for [two of the children]), withholding sufficient nourishment from the children (and adequate water from [two of the children]), forcing [two of the children] to consume food that caused them pain and suffering, such as red pepper flakes, hot sauce, and/or raw onion, causing [one of the children] to ingest excessive sodium or sodium-laden substances, and employing cruel and neglectful disciplinary and child-rearing techniques." *Id*. at 369. The Third Circuit, purportedly applying an elements-based approach to determining whether a sufficiently analogous Guideline provision existed, concluded "that Defendants' offenses of conviction, the assault guideline, and the federal offense of simple assault [we]re within the same proverbial 'ballpark.'" *Id*. at 376. In reaching this conclusion, the Third Circuit noted that (a) the jury in defendants' case, "at least with respect to the cruelty charges, . . . had to find that the government established beyond a reasonable doubt that Defendants 'knowingly committed an act of cruelty against the child,'" *id*. at 381, (b) neither the assault Guideline nor the federal offense of simple assault, similar to the New Jersey statutes at issue, "mandate[d] proof of any sort of bodily injury or even actual physical contact," *id*., (c) "the jury generally rejected Defendants' 'Good Faith Defense,' determining instead that they did not make 'an honest mistake or had an honest misunderstanding about whether his or her acts or omissions were practically certain to cause harm to a child,'" *id*. at 382, (d) "[b]ased on the jury instructions given in this case, a jury finding that a defendant exceeded his or her parental rights by, for example, inflicting unnecessarily severe

21

corporal punishment constituted an implicit finding that defendant thereby committed simple assault," *id*. at 387, and (e) the existing case law established that "the threshold 'sufficiently analogous' guideline inquiry [under § 2X5.1] is satisfied merely if . . . 'some plausible analog[y]' exists between the elements of the defendant's crime and the elements of federal offenses covered by the existing offense guideline," *id*. at 388 (citations omitted).

We conclude that *Jackson* is distinguishable from Clark's case in at least two key respects. First, the New Jersey offenses at issue in *Jackson* effectively required the jury to find that the defendants committed simple assault on their foster children. In other words, the jury had to find that the defendants engaged in affirmative acts. In contrast, the Oklahoma child neglect offense that Clark was convicted of did not require any such finding. Second, and relatedly, the very nature of the New Jersey offenses at issue in *Jackson*, as detailed in the indictment that was returned against the defendants, established that the criminal conduct at issue was intentional in nature, i.e., the defendants, by both their actions and omissions, intended to inflict harm or suffering on their foster children. Here, in contrast, there has been no allegation, let alone a statutory requirement, that Clark intended to inflict harm or suffering on her daughter.

For the foregoing reasons, we affirm the district court's conclusion that there is no sufficiently analogous Guideline for purposes of U.S.S.G. § 2X5.1.

22

*Did the district court plainly err by failing to explain the reasoning for the sentence it imposed?*

In her second issue on appeal, Clark argues that the district court plainly erred by failing to explain the reasoning for the sentence that it imposed. In support, Clark notes that "both parties submitted multiple written objections" to the PSR and "strenuously contested the PSR's facts and application of the statutory sentencing factors." Aplt. Br. at 21. Clark in turn notes that "[a] sentencing hearing was held over the course of three days," and the parties ultimately requested dramatically different sentences. *Id.* "Clark asked for a time served sentence of 12 months," while "the Government asked for a range of 210–262 months." *Id.* Clark asserts, in pertinent part, that the district court failed to "give a sufficient explanation to allow this Court to review the basis for the sentence in a meaningful way," and "said nothing about how it resolved and considered other important sentencing issues raised by the parties." *Id.* at 22.

As a threshold matter, we note that Clark concedes that her trial counsel did not assert a contemporaneous objection to the district court's failure to explain the reasoning for the sentence it imposed, and that, as a result, our plain-error analytical framework applies to the claim. *See United States v. Yurek*, 925 F.3d 423, 444 (10th Cir. 2019) ("To preserve an appellate issue involving the district court's explanation for a sentence, the defendant must lodge a contemporaneous objection.") (quotations omitted).

District courts have a statutory duty to explain the reasons for the sentences they impose. Section 3553(c) of Title 18 states, in relevant part:

> (c) **Statement of reasons for imposing a sentence**.--The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence—
> * * *
> (2) is not of the kind, or is outside the range, described in subsection (a)(4), the specific reason for the imposition of a sentence different from that described, which reasons must also be stated with specificity in a statement of reasons form issued under section 994(w)(1)(B) of title 28, except to the extent that the court relies upon statements received in camera in accordance with Federal Rule of Criminal Procedure 32.

18 U.S.C. § 3553(c).

Consistent with these statutory directives, the Supreme Court has held that a sentencing court commits procedural error by "failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall*, 552 U.S. at 51. More specifically, a district court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id*. at 50; *see also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he [or she] has considered the parties' arguments and has a reasoned basis for exercising his [or her] own legal decisionmaking authority"). If a district court imposes a within-Guidelines sentence, "it must provide only a general statement of its reasons, and need not explicitly refer to either the § 3553(a) factors or respond to every argument for leniency that it rejects in arriving at a reasonable sentence." *United States v. Sanchez-Leon*, 764 F.3d 1248, 1262 (10th Cir. 2014)

24

(quotations omitted). If, however, a district court departs from the advisory Guidelines sentencing range, "the district court must specifically articulate reasons for the degree of departure using any reasonable methodology hitched to the Sentencing Guidelines, including extrapolation from or analogy to the Guidelines." *United States v. Goldberg*, 295 F.3d 1133, 1138 (10th Cir. 2002) (quotations and emphasis omitted). We have held that, "[t]o satisfy the verbalization requirement of § 3553(c)(2), a district court must describe the salient facts of the individual case, including particular features of the defendant or of his crime, and must explain for the record how these facts relate to the § 3553(a) factors." *United States v. Mendoza*, 543 F.3d 1186, 1192 (10th Cir. 2008).

Applying the plain-error framework to the case at hand, we have little trouble concluding that the first two prongs of the plain error test are satisfied in this case. At the conclusion of the three-day sentencing hearing, the district court made no factual findings based upon the evidence presented by the parties, and instead simply announced that it was imposing an 84-month sentence on Clark. In doing so, the district court offered only the following brief explanation for the sentence it imposed:

> In formulating the sentence imposed, this Court has considered the nature and circumstances of the offense, as well as the characteristics and criminal history of the defendant. The Court has further taken into consideration the sentencing guideline calculations contained within the presentence report, in addition to any objections, clarifications, additions or deletions to those guideline calculations identified in the addendum to the report or announced in open court today. While the Court recognizes that it is not bound by the sentencing guideline calculations, the Court has considered them and finds them to be advisory in nature.

25

The sentence prescribed by this Court reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. This sentence affords adequate deterrence to criminal conduct, protects the public from further crimes of this defendant, and provides correctional treatment for the defendant in the most effective manner. The Court has further determined that this sentence is reasonable and sufficient, but not greater than necessary, to meet the objectives and requirements set forth in 18 United States Code, Section 3553(a). The Court notes for the record that, based upon all presently known legal and factual factors, this is the same sentence the Court would impose if given the broadest possible discretion, and the same sentence the Court would impose notwithstanding any judicial fact finding occurring by adoption of the presentence report or at this hearing.

ROA, Vol. II at 556-57. This explanation did little more than recite the factors outlined in § 3553(c) and essentially could have been offered in any case. Nothing in the explanation was unique to Clark or the circumstances of her offense. Nor did the district court's statements truly explain how it arrived at the 84-month sentence, which was critical for purposes of appellate review, given the lack of an applicable Guideline and, in turn, the lack of a total offense level and an advisory Guidelines sentencing range. In short, the district court's short and generic explanation offers no indication at all of how the district court arrived at the sentence it imposed. We therefore conclude that the district court erred by failing to fulfill its duty to explain its reasoning for the sentence imposed, and that this error was plain. *Cf. United States v. Brown*, 654 F. App'x 896, 915 (10th Cir. 2016) (concluding that the sentence imposed was procedurally unreasonable because the district court's brief and generic explanation offered no basis for meaningfully reviewing the sentence).

26

That leaves the final two prongs of the plain error test. The third prong of the plain error test requires a showing that the error affected Clark's substantial rights. In most instances involving plain error in the context of a criminal sentencing proceeding, we have held that this requires a defendant to establish a reasonable probability that, but for the error, the result of the sentencing proceeding would have been different. *See United States v. Uscanga-Mora*, 562 F.3d 1289, 1295 (10th Cir. 2009). We are not persuaded, however, that such a showing is required in the unique circumstances presented here. Indeed, it is unclear precisely how a defendant in these unique circumstances—where there is no applicable Guideline provision, no advisory Guidelines sentencing range, and a statutory maximum sentence of life, all of which effectively afforded the district court with extraordinarily broad discretion to determine what sentence to impose—could ever establish that the district court, had it explained the reasoning for the sentence imposed, would in fact have imposed a different sentence. To simply describe that test is to demonstrate why it is unworkable.

We note that the Supreme Court has "left open the possibility that some errors 'should be presumed prejudicial if the defendant cannot make a specific showing of prejudice.'" *United States v. Bustamante-Conchas*, 850 F.3d 1130, 1138 (10th Cir. 2017) (quoting *United States v. Olano*, 507 U.S. 725, 735 (1993)). Thus, for

27

example, we and other circuits have held that allocution errors are per se prejudicial.[4] *Id.* In a somewhat similar vein, the Supreme Court has held that in cases where the district court improperly calculated the advisory Guidelines range but sentenced the defendant to a term within the correct range, "an incorrectly calculated Guidelines range standing alone suffices to show 'a reasonable probability of a different outcome,'" and that, "'[a]bsent unusual circumstances,' . . . a defendant is not 'required to show more.'" *Id.* (quoting *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346–47 (2016)).

As previously discussed, the purpose of a district court's explanation of its chosen sentence is two-fold: (1) to promote the perception of fair sentencing; and (2) to allow for meaningful appellate review. *Gall*, 552 U.S. at 50. We conclude that the focus of the third prong of the plain error test in the unique circumstances we face here must be on those two purposes, and not on whether the district court would have imposed a different sentence had it offered an adequate explanation.

In the vast majority of criminal cases, there will be an applicable Guideline provision and, in turn, a total offense level and an advisory Guidelines sentencing range. As a result, both the defendant and the appellate court in those cases will at least be aware of the district court's starting point for determining the sentence imposed, and will thus have a workable frame of reference, even if the district court

---

[4] To be sure, we have interpreted the exception in *Olano* as applying only to structural errors. *United States v. Gonzalez-Huerta*, 403 F.3d 727, 733 (10th Cir. 2005).

28

ultimately fails to explain the reasons for the specific sentence imposed. *Cf. Molina-Martinez*, 136 S. Ct. at 1346 (noting that "the Guidelines are not only the starting point for most federal sentencing proceedings but also the lodestar."). But in the rare circumstances presented here—where there is no applicable Guidelines provision, no advisory Guidelines sentencing range, and a statutory maximum sentence of life—a district court's failure to explain how it arrived at its sentence leaves both the defendant and the appellate court without any indication at all of how the sentence was arrived at and, in turn, whether the sentence is fair and just. *Cf. United States v. Rose*, 185 F.3d 1108, 1112 (10th Cir. 1999) (holding that the district court's failure to explain why it imposed consecutive sentences left the appellate panel "in the zone of appellate speculation") (quotations and brackets omitted). We therefore conclude that the district court's plain error in these unique circumstances necessarily affects the defendant's substantial rights, and that no other showing by the defendant is required to satisfy the third prong of the plain error test.

As for the fourth prong of the plain error test, the Supreme Court has held that "[o]nce [the first] three conditions have been met, the court of appeals should exercise its discretion to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Molina-Martinez*, 136 S. Ct. at 1343. We conclude that this standard is satisfied in this case for essentially the same reasons as outlined above regarding the discussion of the third prong of the plain error test. In short, the district court's failure to explain the reasons for its sentence in a case like this, where there is no applicable Guideline

29

provision and no advisory Guidelines range, effectively undercuts the perception of fair sentencing and all but eliminates the opportunity for meaningful appellate review.

For these reasons, we conclude that the district court committed plain error when it failed to explain the reasons for the sentence it imposed on Clark, and that the error must be corrected by remanding the case to the district court for resentencing, which shall include a "complete explanation" of the sentence ultimately imposed. *Chavez-Mesa v. United States*, 138 S. Ct. 1959, 1965 (2018). We do not tether the district court on remand to its prior 84-month sentence; rather, our remand is a general remand for resentencing. *See United States v. West*, 646 F.3d 745, 748 (10th Cir. 2011) (noting that 18 U.S.C. § 3742(g) "directs that when a case is remanded for resentencing, the district court 'shall resentence a defendant in accordance with section 3553 and with such instructions as may have been given by the court of appeals'").

III

We AFFIRM the district court's conclusion that there is no sufficiently analogous Guideline provision, but REMAND to the district court with directions to vacate Clark's sentence and to conduct a resentencing, which shall include an explanation of the reasons for the sentence ultimately imposed.

30