**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 9, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

# UNITED STATES COURT OF APPEALS

# FOR THE TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

　　Plaintiff - Appellee,

v.

JOEL RICHARD SMITH,

　　Defendant - Appellant.

No. 24-5088

---

UNITED STATES OF AMERICA,

　　Plaintiff - Appellee,

v.

AMANDA IRENE SMITH,

　　Defendant - Appellant.

No. 24-5096

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:21-CR-00553-SEH-1 &**
**D.C. No. 4:21-CR-00553-SEH-2)**

---

Leah D. Yaffe, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with her on the briefs), Office of the Federal Public Defender, Denver, Colorado, for Defendant-Appellant Joel Richard Smith.

Robert D. Gifford, II, Gifford Law, P.L.L.C., Oklahoma City, Oklahoma, for Defendant-Appellant Amanda Irene Smith.

Leena Alam, Assistant United States Attorney (Clinton J. Johnson, United States Attorney, with her on the briefs), Tulsa, Oklahoma, for Plaintiff-Appellee.

_____

Before **MATHESON**, **CARSON**, and **ROSSMAN**, Circuit Judges.

_____

**ROSSMAN**, Circuit Judge.

_____

After a jury trial in federal court, Appellants Joel Smith and his wife Amanda Smith (collectively, the Smiths) were convicted of child abuse and child neglect in violation of Oklahoma and federal law. The district court sentenced them both to prison—Mr. Smith for 180 months and Mrs. Smith for 240 months. The Smiths appealed separately, challenging their convictions and sentences on numerous grounds. We consolidated the appeals after oral argument based on their significant factual and legal overlap. *See* Fed. R. App. P. 3(b)(2).

We identify only one reversible error: Mr. Smith's sentence is procedurally unreasonable. Every federal sentencing proceeding begins with determining the guideline section "applicable to the offense of conviction." U.S.S.G. § 1B1.2(a). But where no guideline has been promulgated for the offense, the district court must "apply the most

analogous offense guideline." U.S.S.G. § 2X5.1. The district court concluded there was no analogous guideline for Oklahoma's child-abuse-by-injury statute, OKLA. STAT. tit. 21, § 843.5(A) (2024). But we conclude U.S.S.G. § 2A2.2, aggravated assault, is sufficiently analogous, and the district court's contrary conclusion was not a harmless error. Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we vacate Mr. Smith's sentence and remand for resentencing consistent with this opinion. We otherwise affirm.

## I

## A

In 2014, Joel Smith's then five-year-old niece, H.M., moved in with him and his wife Amanda Smith.[1] Mr. Smith and H.M. are members of the Cherokee Nation. Mrs. Smith is non-Indian.

On April 5, 2019, H.M. ran away to a neighbor's home. She appeared malnourished and unwashed, was extremely hungry, wore a diaper, smelled of urine and feces, and showed signs of physical abuse. The neighbor called police. H.M. was hospitalized for a week to treat her infections and

---

[1] At trial, H.M. was also called M.V. and K.B. For sake of consistency, we refer to her as "H.M.," as Appellants do. (The government uses "MV."). To distinguish the relevant briefing, we append "J.S." to citations related to Joel Smith and "A.S." to citations related to Amanda Smith.

malnutrition. An investigation revealed H.M. experienced severe neglect and abuse while she lived with the Smiths. H.M. was deprived of food, forced to perform manual labor outside, beaten frequently with a belt and a livestock whip, handcuffed at night, and made to wear a diaper. At the time she was found, H.M. was nine years old and weighed only 42 pounds—eight pounds less than when she entered the Smiths' care.

## B[2]

On July 18, 2022, a federal grand jury indicted the Smiths.[3] Mr. Smith was charged with one count of child abuse in Indian country in violation of Oklahoma law, tit. 21, § 843.5(A); and one count of child neglect in Indian country in violation of Oklahoma law, *id.* § 843.5(C). Because Mr. Smith is Indian and his offenses occurred in Indian country, the government had authority to punish both crimes via the Major Crimes Act (MCA), 18 U.S.C. § 1153. Mrs. Smith was charged with one count of child abuse and one count of child neglect under the same Oklahoma statutes. Because Mrs. Smith is not Indian, her victim is Indian, and her offenses occurred in Indian country, the government had authority to punish both crimes under the

---

[2] We describe the procedural background here and then provide more details when analyzing the arguments on appeal.

[3] The July 18 indictment superseded an earlier indictment. Like the parties, we refer to the operative superseding indictment as "the indictment" and discuss the non-operative indictment only if necessary.

Assimilative Crimes Act (ACA), 18 U.S.C. § 13, as applied to Indian country via the General Crimes Act (GCA), 18 U.S.C. § 1152. The indictment further charged each defendant with aiding and abetting the other in the commission of these offenses.

The Smiths pleaded not guilty. Their joint jury trial began on June 20, 2023, and lasted three days. Mrs. Smith testified, but Mr. Smith did not. The jury also heard testimony from H.M. and Mrs. Smith's daughter Allison Smith. Mr. Smith's primary defense was that he did not abuse or neglect H.M. Mrs. Smith's primary defense was H.M. had challenging medical needs, and given these circumstances, the government had not carried its burden of showing criminal misconduct.

Near the end of the trial, Mrs. Smith objected to the government's proposed jury instruction on aiding and abetting and asked to be dismissed from the indictment. In support, she argued the MCA applies only to an "Indian" defendant, so the statute cannot be used to prosecute her, a non-Indian, as an aider or abettor. *See* 18 U.S.C. § 1153(a). Mr. Smith joined in the objection. He argued, because he is Indian, he cannot be found guilty of aiding and abetting under the GCA, a statute that does not apply to "offenses committed by one Indian against the person or property of another Indian." 18 U.S.C. § 1152. The district court denied the motions and

5

instructed the jury on aiding and abetting. On June 23, the jury found the Smiths guilty on one count each of child abuse and child neglect.

Mrs. Smith then moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 and a new trial under Rule 33. As relevant here, she argued her conviction should be dismissed because, after *Oklahoma* v. *Castro-Huerta*, 597 U.S. 629 (2022), a federal court would lack subject-matter jurisdiction over her offenses. The district court denied the motion.

Before sentencing, a probation officer prepared a presentence investigation report (PSR) for Mr. Smith. In calculating the advisory Guidelines range, the PSR stated no analogous guideline exists for a violation of child abuse in Indian country or child neglect in Indian country. When no sufficiently analogous guideline exists, the PSR explained, the provisions of 18 U.S.C. § 3553 control. The PSR then concluded the Guidelines range is up to life imprisonment per count. Mr. Smith objected, arguing the district court should use U.S.S.G. § 2A2.2, the federal sentencing guideline for aggravated assault, when calculating his advisory range. At sentencing, the court ultimately rejected Mr. Smith's argument to apply U.S.S.G. § 2A2.2, opting instead for the PSR's approach.

About 22 hours before the Smiths' sentencing, the government submitted four letters, described as "victim-impact statements," to the

6

district court. The Smiths requested more time to review the letters or to quash them. The district court refused. Applying the factors under § 3553(a), the district court sentenced Mr. Smith to concurrent terms of 180 months of imprisonment. The district court then sentenced Mrs. Smith to concurrent terms of 240 months of imprisonment.

Almost two weeks after sentencing, Mrs. Smith filed an amended second motion for judgment of acquittal, new trial or correction of sentence under Rules 29 and 33. The district court denied the motion, concluding Mrs. Smith filed it too late.

These timely appeals followed.

## II

The Smiths seek reversal, raising five issues for our review. Three issues challenge their convictions, and two urge resentencing. We now describe the issues in the order we will discuss them.

*First*, Mr. Smith contends the district court miscalculated his advisory Guidelines range, and thus imposed a procedurally unreasonable sentence, by mistakenly concluding there is no sufficiently analogous guideline for his child abuse conviction under Oklahoma law, tit. 21, § 843.5(A).

*Second*, the Smiths both argue the district court erroneously refused to consider their "objection" to the aiding-and-abetting jury instruction.

*Third*, Mrs. Smith claims the district court erred in denying her motion to dismiss the indictment for lack of jurisdiction under *Castro-Huerta*, 597 U.S. 629 (2022).

*Fourth*, Mrs. Smith argues the district court erroneously determined her second motion for a new trial and judgment for acquittal was untimely.

*Fifth*, and finally, Mrs. Smith seeks resentencing, contending the district court improperly considered letters submitted by the government on the eve of sentencing and that were written by individuals who did not count as "victims" under 18 U.S.C. § 3771(e)(2).

### III

We begin with Mr. Smith's argument that the district court miscalculated his advisory Guidelines range and imposed a procedurally unreasonable sentence. Recall, Mr. Smith was convicted of child abuse by injury in violation of Oklahoma law, tit. 21, § 843.5(A) and child neglect in violation of § 843.5(C). Before sentencing, all agreed there is no expressly promulgated guideline for child abuse by injury. Mr. Smith urged the court to use the aggravated assault guideline in U.S.S.G. § 2A2.2 as a "place to start," which in his calculation would have yielded an advisory range of 46–57 months in prison. RV.37. The district court refused, concluding Mr. Smith could be sentenced to "any number of years up to life imprisonment." RV.49. The district court then applied the § 3553(a) factors

8

and imposed a "total term of 180 months" in custody, ordering the sentences to run concurrently. RV.67.

On appeal, Mr. Smith contends U.S.S.G. § 2A2.2 is "the most analogous offense guideline" within the meaning of U.S.S.G. § 2X5.1 and thus should have been used to calculate his applicable Guidelines range. We agree. Because the government has not met its burden of showing this procedural error was harmless, we must remand for resentencing.

## A

### 1

"Every sentence must be procedurally reasonable." *United States* v. *Candelaria*, 151 F.4th 1261, 1265 (10th Cir. 2025). "Procedural reasonableness requires, among other things, a properly calculated Guidelines range." *United States* v. *Jackson*, 138 F.4th 1244, 1256 (10th Cir. 2025) (internal quotation marks omitted). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States* v. *Ray*, 704 F.3d 1307, 1315 (10th Cir. 2013).

In calculating the advisory Guidelines range, the district court must first "[d]etermine the offense guideline section . . . applicable to the offense of conviction." U.S.S.G. § 1B1.2(a). If the offense of conviction "is a felony for which no guideline expressly has been promulgated," then the district

9

court must apply "the most analogous offense guideline." U.S.S.G. § 2X5.1. To that end, the district court "must first 'determine whether *any* guideline, and there can be more than one, is sufficiently analogous to the defendant's crime of conviction.'" *United States* v. *Clark*, 981 F.3d 1154, 1162 (10th Cir. 2020) (quoting *United States* v. *Nichols*, 169 F.3d 1255, 1270–71 (10th Cir. 1999)). When no sufficiently analogous guideline exists, "the provisions of 18 U.S.C. § 3553 shall control[.]" U.S.S.G. § 2X5.1.

"When evaluating the district court's interpretation and application of the Sentencing Guidelines, we review legal questions de novo and factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States* v. *Zamora*, 97 F.4th 1202, 1207–08 (10th Cir. 2024) (internal quotation marks omitted). Relevant here, we review *de novo* whether a sufficiently analogous guideline exists for a particular crime of conviction.[4] *See Clark*, 981 F.3d at 1162. "If we find a procedural error, resentencing is required only if the error was not harmless." *United States* v. *Gieswein*, 887 F.3d 1054, 1061 (10th Cir.

---

[4] The parties agree the district court *sua sponte* raised and resolved the analogousness issue on the merits, preserving Mr. Smith's appellate argument. The parties thus agree "this Court reviews *de novo* the district court's determination 'whether *any* guideline . . . is sufficiently analogous to the defendant's crime of conviction.'" J.S. Resp. Br. at 26 (quoting *Clark*, 981 F.3d at 1162).

2018) (internal quotation marks omitted). The government must prove harmlessness by showing, "by a preponderance of the evidence," the district court "would have imposed the same sentence" without the error. *United States* v. *Eddington*, 65 F.4th 1231, 1243 (10th Cir. 2023).

2

Determining whether a sufficiently analogous guideline exists is "a task of comparing the elements of the defendant's crime of conviction to the elements of federal offenses already covered by a specific guideline. The determination on this point is a purely legal one, and the district court need not consider the underlying factual circumstances of the defendant's case." *Clark*, 981 F.3d at 1162 (quoting *Nichols*, 169 F.3d at 1270–71). We have stressed "this inquiry must be conducted in a flexible and open-ended fashion." *Id.* at 1163 (quoting *United States* v. *Jackson*, 862 F.3d 365, 375 (3d Cir. 2017)). A "perfect match of elements is not necessary (or even expected)." *Id.* A "sufficiently analogous offense will *necessarily not* have the same elements as the offense of conviction." *Id.* at 1166 (emphasis added). "Instead, the proffered guideline need only be within the same proverbial 'ballpark' as the offense of conviction." *Id.* at 1163 (quoting *Jackson*, 862 F.3d at 375).

Assimilated crimes do not have a "perfect match" with federal offenses.[5] *Id.* Still, assimilated crimes have analogs in the Sentencing Guidelines. The background note to § 2X5.1 explains the Guidelines "cover the type of criminal behavior that most [assimilated] offenses proscribe." § 2X5.1 cmt. background (2025). This captures a few fundamental principles attendant to sentencing for assimilated offenses. The Sentencing Commission "contemplates that most assimilated offenses *will* actually have a 'sufficiently analogous' offense guideline." *Jackson*, 862 F.3d at 376 (emphasis added). And "the most analogous guideline is the one that covers the 'type of criminal behavior' of which the defendant was convicted." *Id.* (quoting *United States* v. *Calbat*, 266 F.3d 358, 363 (5th Cir. 2001)).

To find the "most analogous offense guideline" in a case involving 18 U.S.C. §§ 1152 or 1153, courts look to the elements of the state assimilated offense. *E.g.*, *Clark*, 981 F.3d at 1162; *see* U.S.S.G. amend. 781 (Nov. 1, 2014) (explaining §§ 1152 and 1153 "are simply jurisdictional statutes that do not provide substantive offenses"). When comparing elements, we have considered factors such as the "type of injury" required, if any; the "means" of committing each crime, such as whether the statute

---

[5] Assimilation otherwise would be unnecessary, since the offense could be charged directly under a substantive federal criminal law. *See Jackson*, 862 F.3d at 376.

requires an act of commission or omission; and whether the crimes are "intentional in nature." *Clark*, 981 F.3d at 1164, 1164–67. A guideline is not sufficiently analogous to the offense of conviction if the elements are "significantly different." *Id.* at 1164. As the Supreme Court has explained in a different context, a useful analogy "captures the gist." *Amgen Inc.* v. *Sanofi*, 598 U.S. 594, 615 (2023). Put simply, we will apply a federal guideline if "some plausible analogies" exist between the elements of the defendant's crime and the elements of federal offenses covered by the guideline. *United States* v. *Rakes*, 510 F.3d 1280, 1288 (10th Cir. 2007).

## B

Applying these principles, we turn to Mr. Smith's appellate arguments.

## 1

Urging reversal, Mr. Smith argues the elements of Oklahoma's child-abuse-by-injury crime, tit. 21, § 843.5(A), are sufficiently analogous to the elements of the federal guideline for aggravated assault, U.S.S.G. § 2A2.2.[6]

---

[6] Mr. Smith also argues the district court erred by failing to consider whether the simple-assault guideline, U.S.S.G. § 2A2.3, is sufficiently analogous. But we deem the argument waived and do not consider it. Mr. Smith never raised an argument to the district court about the analogousness of § 2A2.3. Nor did the district court *sua sponte* raise and resolve whether § 2A2.3 could apply. Ordinarily, we would review Mr. Smith's new argument for plain error. But he has not argued for plain error and, at oral argument, acknowledged "this case ends up in § 2A2.2,"

Section 2A2.2 defines aggravated assault as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (*i.e.*, not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1. Under Oklahoma law, child abuse by injury involves "the act of willfully or maliciously injuring, torturing or maiming a child under eighteen (18) years of age by any person." Tit. 21, § 843.5(A), (O)(1)(b); *see* Okla. Unif. Jury Instruction–Crim. 4-35 (listing the elements as when a person (i) "willfully/maliciously" (ii) "injuring/tortured/maimed" (iii) "a child under the age of eighteen" (emphasis omitted)).

Mr. Smith argues the elements of Oklahoma's child-abuse statute share much in common with the elements of federal aggravated assault. He relies on *Clark*, which he reads to have "summed up" the elements of federal assault as (i) an "affirmative act" that (ii) results in the victim being significantly injured. J.S. Op. Br. at 10 (quoting *Clark*, 981 F.3d at 1165–66). In his view, child abuse by injury contains the elements of "assault" identified in *Clark*—"injuring, torturing or maiming" a child. OKLA. STAT.

---

and not § 2A2.3. J.S. Oral Arg. at 2:13–:16. We thus need not, and do not, resolve whether § 2A2.3 is sufficiently analogous to child abuse by injury.

tit. 21, § 843.5(O)(1)(b); *see also* Okla. Unif. Jury Instruction–Crim. 4-35. So, says Mr. Smith, "the crime of child abuse by injury *does* require the defendant to commit an affirmative act." J.S. Op. Br. at 12. And child abuse by injury "typically *does* require the victim to be injured, with varying degrees of severity." J.S. Op. Br. at 12, and n.7. "[T]hese are meaningful similarities," Mr. Smith explains, and "easily pass the loose elements-comparison test" used in this circuit to identify sufficiently analogous guidelines under U.S.S.G. § 2X5.1. J.S. Op. Br. at 12. We agree.

Federal law does not expressly define "aggravated assault," and so we consider statutes cited in § 2A2.2 as relevant provisions. *See* U.S.S.G. § 2A2.2 cmt.; U.S.S.G. App. A (citing, among others, 18 U.S.C. §§ 113(a)(2), (3), (6), (8), and 2340A); *see Nichols*, 169 F.3d at 1270 (observing the Guidelines reveal "the Commission's belief" whether an offense is "sufficiently analogous"). These provisions indicate federal aggravated assault typically involves an affirmative act resulting in a serious injury plus an aggravating factor. To be an "assault," aggravated assault requires the defendant "to have either attempted to batter the victim or to have placed the victim in reasonable apprehension of immediate bodily harm." *Clark*, 981 F.3d at 1165–66. To be "aggravated," the assault must include an "aggravating" factor, which includes use of "a dangerous weapon," a "serious bodily injury," an "attempt[] to strangle or suffocate," or the "intent

15

to commit another felony." U.S.S.G. § 2A2.2 n.1, and cmt. Oklahoma child abuse by injury typically involves an affirmative act resulting in a serious injury, as indicated by the element of "injuring, torturing, or maiming." OKLA STAT. Tit. 21, § 843.5(O)(1). It also has an aggravating factor: The abuse must involve "a child under eighteen (18) years of age[.]" *Id.* The two crimes are thus "within the same proverbial 'ballpark.'" *Clark*, 981 F.3d at 1163.

Further support comes from the commentary to § 2A2.2 and Appendix A, which list roughly 40 federal provisions under aggravated assault. *See United States* v. *Osborne*, 164 F.3d 434, 438 (8th Cir. 1999) (looking at "federal offenses which are treated as aggravated assault under the Sentencing Guidelines" to help define aggravated assault under § 2A2.2). Many of these provisions bear only a faint resemblance to the Guidelines' own definition of "aggravated assault." And their aggravating factors vary widely.[7] The breadth and diversity of the statutes and

---

[7] For examples, the Guidelines lists a statute prohibiting an act leading to "serious bodily injury" by "[s]towaways on vessels or aircraft," 18 U.S.C. § 2199(2); a statute criminalizing anyone who "intentionally kills or attempts to kill [an] unborn child," 18 U.S.C. § 1841(a)(2)(C); a statute criminalizing assault with certain enumerated aggravating factors in the context of "[t]errorist attacks . . . against mass transportation systems," 18 U.S.C. § 1992(a)–(b) (bolding omitted); a statute that prohibits acts leading to "serious bodily injury" during the "[d]estruction of vessel or maritime facility," 18 U.S.C. § 2291(a)(7) (bolding omitted); a statute criminalizing acts of violence against federal officials, 18 U.S.C.

aggravating factors support the inference that the Sentencing Commission intended for § 2A2.2 to be analogized liberally with a wide variety of crimes. We have no difficulty analogizing the age-of-the-victim element of child abuse by injury to the assorted "aggravating" elements found in the federal provisions associated with U.S.S.G. § 2A2.2.

*Clark* does not compel a different result. There, we found no plausible analogies because of "significant differences" between the elements of simple assault and the elements of child neglect.[8] *Clark*, 981 F.3d at 1165. But *Clark* focused on both a different sentencing guideline (simple assault, U.S.S.G. § 2A2.3, not aggravated assault, U.S.S.G. § 2A2.2) and a different crime of conviction (child neglect, tit. 21, § 843.5(C), not child abuse, tit. 21, § 843.5(A)). Both child abuse by injury and aggravated assault each usually involve an affirmative act. Child abuse by injury and aggravated assault each also usually result in bodily injury. Indeed, child abuse is unlike child neglect precisely because it typically involves bodily injury. Thus, the "significant differences" that led the *Clark* court to find no plausible analogy

---

§ 111; a statute criminalizing acts of violence against the President, 18 U.S.C. § 1751; and a statute criminalizing assaults in the context of "[a]cts of terrorism transcending national boundaries." 18 U.S.C. § 2332b(a)(1) (bolding omitted).

[8] Federal assault requires an act of commission, whereas child neglect does not. And federal assault often involves a serious bodily injury, whereas child neglect does not.

between child neglect and simple assault are absent here. *Clark*, 981 F.3d at 1165.

2

The government offers two counterarguments, but neither is availing. *First*, the government contends federal aggravated assault and child abuse by injury require a significantly different *mens rea*. Federal aggravated assault can be committed with a *mens rea* of "recklessness," the government maintains, but Oklahoma child-abuse requires a *mens rea* of "willfully or maliciously." J.S. Resp. Br. at 28–30. In the government's view, § 2A2.2 is not an analogous guideline because Oklahoma child abuse requires a "significantly higher mens rea than federal assault resulting in serious or substantial bodily injury." J.S. Resp. Br. at 30.

The analogousness inquiry does not demand the level of specificity the government suggests. What matters is both crimes require an intentional act, making them what the common law referred to as "general intent" crimes. *United States* v. *Zunie*, 444 F.3d 1230, 1234–35 (10th Cir. 2006) ("[A] general intent crime is one in which an act was done voluntarily and intentionally, and not because of mistake or accident. . . . [A] crime committed with purpose, knowledge, or recklessness amounts to an act done voluntarily and intentionally." (internal quotation marks omitted)); *see Clark*, 981 F.3d at 1167 (discussing whether "the criminal conduct at issue

18

was intentional in nature"). Child abuse under § 843 is a "general intent" crime that must be committed "willfully or maliciously," which means "not accidentally or involuntarily." *Fairchild* v. *State*, 998 P.2d 611, 619, 622 (Okla. Crim. App. 1999) (internal quotation marks omitted), *as corrected on denial of reh'g* (May 11, 2000). Although the assault guidelines cover multiple federal crimes with a "range of scienter requirements," *United States* v. *Harris*, 10 F.4th 1005, 1015 (10th Cir. 2021), in the main, "assault resulting in serious bodily injury is a general intent crime," *Zunie*, 444 F.3d at 1233 (citing *United States* v. *Benally*, 146 F.3d 1232, 1237 (10th Cir. 1998)); *see United States* v. *Pettigrew*, 468 F.3d 626, 639 (10th Cir. 2006) ("Assault is a general intent crime[.]"). It "is inconsequential" that elements such as "the mens rea requirement . . . do not precisely align." *Harris*, 10 F.4th at 1015 (discussing whether a state crime can be assimilated at all under the Assimilative Crimes Act). We are satisfied that federal aggravated assault and Oklahoma child abuse by injury involve sufficiently analogous levels of intent.

*Second*, the government contends federal aggravated assault and child abuse have different injury requirements. The government says Oklahoma's child-abuse-by-injury statute does not require a bodily injury and can be committed with just "extreme mental cruelty." Tit. 21,

19

§ 843.5(A). By contrast, federal aggravated assault "requires" the victim suffer a "serious bodily injury." J.S. Resp. Br. at 28.[9]

We disagree. Neither § 843.5(A) nor federal aggravated assault *requires* a bodily injury. Even assuming § 843.5(A) can be committed with "extreme mental cruelty,"[10] "aggravated assault" under federal law requires an assault and an aggravating circumstance. An "assault" can be committed by "an *attempted* battery or . . . placing another in reasonable *apprehension* of immediate bodily harm." *Clark*, 981 F.3d at 1165 (emphasis added). And, recall, the Guidelines state an "aggravated" assault involves use of "a

---

[9] The government also argues application of the aggravated-assault guideline would be "inappropriate" here because Mr. Smith's child abuse "encompassed a years-long course of abuse ranging from physical beatings to punitive deprivation of food and psychological torture." J.S. Resp. Br. at 31. The government's reliance on the factual record in the analogousness inquiry is misplaced. Determining whether a guideline is sufficiently analogous to a crime of conviction "is a purely legal one, and the district court need not consider the underlying factual circumstances of the defendant's case." *Clark*, 981 F.3d at 1162 (quoting *Nichols*, 169 F.3d at 1270–71). We reject the government's invitation to consider the facts underlying the crime of conviction when conducting this "purely legal" analysis. *Id.*

[10] Mr. Smith argues it is "somewhat unsettled" whether a defendant can be convicted of Oklahoma child abuse by injury for causing "only mental injury." J.S. Reply Br. at 6. According to Mr. Smith, it is ultimately immaterial whether mental cruelty is a means of committing child abuse by injury, because "it is clear that *most* means of committing child abuse by injury involve some degree of bodily injury." J.S. Reply Br. at 6 (emphasis added). We need not resolve this question today, and thus state no opinion on it. Even assuming the government is correct that mental cruelty is a means of committing child abuse by injury, this fact does not defeat the analogy: Federal assault also does not "require" a serious bodily injury.

20

dangerous weapon," a "serious bodily injury," an "attempt[] to strangle or suffocate," or "intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1. Neither § 2A2.2 nor § 843.5(A) requires physical injury.

For purposes of evaluating plausible analogies, we find it sufficient that both federal aggravated assault and child abuse by injury *typically* result in serious injury to the victim. Oklahoma law does not include an element requiring a specific degree of injury. But it is enough that § 843.5(A) does "contemplate serious bodily injury."[11] *Osborne*, 164 F.3d at 439; *United States* v. *Betts*, 99 F.4th 1048, 1058 (7th Cir. 2024) (finding a plausible analogy where the state statute "does contemplate, *or can involve*," an element found in the federal guideline but "not include[d] as an exact element" in the state statute (emphasis added)). As the government

---

[11] Oklahoma law defines "maiming" as, "with premeditated design to injure another, inflict[ing] upon his person any injury which disfigures his personal appearance or disables any member or organ of his body or seriously diminishes his physical vigor[.]" OKLA. STAT. tit. 21, § 751; *see* Okla. Unif. Jury Instruction–Crim. 4-40D (similar). Oklahoma courts have defined "torture" as "the infliction of great physical anguish . . . or extreme mental cruelty." *Hawkins* v. *State*, 891 P.2d 586, 597 (Okla. Crim. App. 1994); *see* Okla. Unif. Jury Instruction–Crim. 4-40D (similar). Oklahoma law also clarifies that child abuse does not include "ordinary force as a means of discipline, including but not limited to spanking, switching or paddling." OKLA. STAT. tit. 21, § 844; *see also* Okla. Unif. Jury Instructions– Crim. 4-35A ("It is not child abuse . . . to use reasonable and ordinary force to discipline a child, including, but not limited to, spanking, switching, or paddling, so long as the force is reasonable in manner and moderate in degree.").

acknowledges, "a sufficiently analogous offense will *necessarily not* have the same elements as the offense of conviction[.]" J.S. Resp. Br. at 28 (emphasis added) (quoting *Clark*, 981 F.3d at 1166). Here, the gist matches: Both offenses contemplate an affirmative act and a serious injury.

But even assuming for argument's sake that federal assault "requires" a serious bodily injury and child abuse by injury does not, we would still find the two offenses sufficiently analogous. As the Third Circuit explained, "it is only to be expected that the offense of conviction may include more expansive elements than the federal offense or additional elements missing from the federal counterpart." *Jackson*, 862 F.3d at 382 (quotation omitted). Analogies necessarily contemplate "unlike things." *Analogy*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/analogy (last visited Apr. 3, 2026); *accord Analogy*, AMERICAN HERITAGE DICTIONARY 64 (4th ed. 2000) ("Similarity in some respects between things that are otherwise dissimilar."). To analogize is to recognize similarity *and* difference. *See Jackson*, 862 F.3d at 376 ("After all, analogy does not mean identity. It implies difference." (internal quotation marks omitted)).

We hold Oklahoma's child-abuse-by-injury statute is sufficiently analogous to the federal sentencing guideline for aggravated assault. Section 843.5(A) appears "within the same proverbial 'ballpark'" as § 2A2.2. *Clark*, 981 F.3d at 1163. The district court committed procedural error in

22

concluding otherwise. By failing to use the analogous guideline, the district court began its sentencing calculation at the wrong "starting point in the process." *United States* v. *Joe*, 696 F.3d 1066, 1073 (10th Cir. 2012). But that does not end the inquiry. We next must consider whether the error is harmless.

## C

"[O]nce the court of appeals has decided that the district court misapplied the Guidelines, a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless, *i.e.*, that the error did not affect the district court's selection of the sentence imposed." *Williams* v. *United States,* 503 U.S. 193, 203 (1992) (citing Fed. R. Crim. P. 52(a)). "The government bears the burden of demonstrating harmlessness by a preponderance of the evidence." *Gieswein*, 887 F.3d at 1061; *United States* v. *Lewis*, 904 F.3d 867, 871 (10th Cir. 2018) (stating "preponderance of the evidence" means "more likely than not" (internal quotation marks omitted)). Unless the government carries its burden, an "error in calculating the sentencing guidelines *necessitates* remand." *United States* v. *Brooks*, 67 F.4th 1244, 1250 (10th Cir. 2023) (emphasis added).

The government makes two arguments for harmlessness, but neither is persuasive.

23

1

The government first urges us to apply the concurrent-sentence doctrine. "Under that discretionary doctrine," we can choose to "hold harmless an erroneous sentence premised on a valid conviction if such sentence runs concurrently to an equal or longer sentence based upon another charge of an indictment[.]" *United States* v. *Williams*, 48 F.4th 1125, 1145 (10th Cir. 2022) (quoting *United States* v. *Segien*, 114 F.3d 1014, 1021 (10th Cir. 1997), *overruled on other grounds as recognized in United States* v. *Hathaway,* 318 F.3d 1001, 1006 (10th Cir. 2003)). Mr. Smith "raises no reasonableness challenge to his 180-month child-neglect sentence," and so the government contends this court "should exercise its discretion to decline to review his challenge to his concurrent child-abuse sentence." J.S. Resp. Br. at 32.

For his part, Mr. Smith insists we should decline to use the concurrent-sentence doctrine here and relies instead on the sentencing-package doctrine. "This doctrine generally permits the district court to resentence a defendant on convictions that remain after he succeeds in getting one or more convictions vacated—even if he did not challenge the convictions on which he is resentenced." *United States* v. *Hicks*, 146 F.3d 1198, 1202 (10th Cir. 1998). Under our precedent, the sentencing-package doctrine can apply after either a sentence or a conviction has been vacated.

24

*See United States* v. *Catrell*, 774 F.3d 666, 670 (10th Cir. 2014) (rejecting the argument "the sentencing package doctrine only applies when a *conviction* has been vacated, as opposed to just a sentence"); *Ward* v. *Williams*, 240 F.3d 1238, 1243–44 (10th Cir. 2001) (remanding for the district court to resentence on all counts of conviction after vacating only one sentence). The doctrine also can apply to vacate concurrent sentences. *See, e.g.*, *Catrell*, 774 F.3d at 669–71 (applying the sentencing-package doctrine and remanding for resentencing on concurrent counts of conviction that were longer than the sentence vacated initially); *United States* v. *Clements*, 86 F.3d 599, 600–01 (6th Cir. 1996) (explaining courts of appeals wield power "to vacate and remand an entire sentencing package despite the fact that it includes an unchallenged sentence").

We agree with Mr. Smith. The concurrent-sentence doctrine is a poor fit for this case. *See Williams*, 48 F.4th at 1145. The conduct underlying Mr. Smith's convictions overlaps.[12] J.S. Resp. Br. at 9–13, 35 (describing Mr. Smith's "abuse and neglect" of H.M. without clarifying what conduct supports which count). It is not surprising the district court seemed to view Counts 1 and 2 as connected. When discussing the crimes, the district court

---

[12] The government acknowledged as much at oral argument. *See* J.S. Oral Arg. at 30:56–31:07 (recognizing the child neglect and child abuse convictions were "based on related conduct").

25

discussed child neglect and abuse together. *E.g.*, RV.56 (observing "this offense involved abuse and neglect of a minor victim"), 65 ("This case involved the Defendant, a citizen of the Cherokee Nation, physically and verbally abusing and neglecting the victim[.]"). Then, relying on a miscalculated Guidelines range as its point of departure for sentencing, the district court imposed a "total term of 180 months" as to Counts 1 and 2 *before* ordering the sentences to run concurrently. RV.67. In explaining the sentence, the district court did not distinguish between the counts of conviction or otherwise suggest it would have imposed the same sentence for Mr. Smith's child-abuse conviction independent of the child-neglect conviction.

Under these circumstances, where the Guidelines were miscalculated and the record shows the district court viewed the sentences in a multicount conviction as interdependent, we will exercise our discretion to apply the sentencing-package doctrine. That doctrine recognizes that "sentencing on multiple counts is an inherently interrelated, interconnected, and holistic process[.]" *United States* v. *Touray*, 151 F.4th 1317, 1333 (11th Cir. 2025) (internal quotation marks omitted). The sentencing-package rule "is not so much a doctrine as it is a common judicial practice" that "a criminal sentence in a multi-count case is inherently a package of sanctions that the district court utilizes to effectuate its sentencing intent[.]" *United States* v.

*Fowler*, 749 F.3d 1010, 1015–16 (11th Cir. 2014) (internal quotation marks omitted); *United States* v. *Spencer*, 998 F.3d 843, 845 n.1 (8th Cir. 2021) ("Under the [Sentencing] Guidelines, a multicount sentence is a package." (internal quotation marks omitted)). When "the sentencing package becomes 'unbundled,' . . . the district court has the authority to recalculate and reconsider the defendant's sentence for it to comport with the district court's original intentions at sentencing." *Fowler*, 749 F.3d at 1017 (internal quotation marks and brackets omitted). As the Supreme Court has explained, "an appellate court when reversing one part of a defendant's sentence may vacate the entire sentence . . . so that, on remand the trial court can reconfigure the sentencing plan[.]" *Pepper* v. *United States*, 562 U.S. 476, 507 (2011) (internal quotation marks omitted).

We cannot say this is a case where sentences were "imposed independently" or "treated discretely." *United States* v. *Junius*, 86 F.4th 1027, 1028 n.1 (3d Cir. 2023); *see Oslund* v. *United States*, 944 F.3d 743, 747 (8th Cir. 2019) (declining to apply the sentencing-package doctrine where the "the record indicated that the district court would have applied the same sentence regardless" of later-invalidated sentences). Rather, the record suggests Mr. Smith's crimes, and the sentences flowing from them, "were clearly interdependent." *United States* v. *Soy*, 413 F.3d 594, 606 (7th Cir. 2005); *see Hicks*, 146 F.3d at 1202 (applying the sentencing-

27

package doctrine where "the sentences are interdependent"); *United States* v. *Pratt*, 915 F.3d 266, 275 (4th Cir. 2019) (remanding because the district court "likely crafted a sentencing package with all eight convictions in mind" and "there may be some chance" that a resentencing would lead to a new sentencing package).

We thus apply the sentencing-package doctrine and reject the government's argument that the error is harmless under the concurrent-sentence doctrine.

**2**

The government next claims any error is harmless because the district court would have imposed the same sentence even under the correctly calculated Guidelines range. Had the district court correctly applied § 2A2.2, Mr. Smith's advisory Guidelines range would have been 70–87 months in prison. In the government's opinion, the district court would have deemed a custodial sentence of 70–87 months "woefully inadequate" to "address the harms of child abuse" and would necessarily have varied upward to impose the same 180-months sentence. J.S. Resp. Br. at 35 (quoting *United States* v. *Walker*, 74 F.4th 1163, 1181 (10th Cir. 2023)). We are not persuaded.

"[S]entencing decisions are anchored by the Guidelines[.]" *Peugh* v. *United States*, 569 U.S. 530, 541 (2013). The Guidelines "exert gravitational

pull on *all* sentencing decisions[.]" *United States* v. *Trujillo-Terrazas*, 405 F.3d 814, 819 (10th Cir. 2005) (emphasis added). It is unsurprising that a procedural error at sentencing "runs the risk of affecting the ultimate sentence *regardless of* whether the court ultimately imposes a sentence within or outside the range the guidelines suggest." *Hess*, 106 F.4th at 1036–37 (internal citations and quotation marks omitted).

Nothing in the record "persuade[s] us that [the district court's] error in construing the guidelines had no effect on its sentencing decision." *United States* v. *Sabillon-Umana*, 772 F.3d 1328, 1334–35 (10th Cir. 2014). Just the opposite: the court seemed to view Mr. Smith's sentences as a holistic package. *See* RV.65–67. And, in any event, the Supreme Court has explained that a district court's procedural error in a Guidelines case suffices for a remand even where "there is no other evidence that the sentencing outcome would have been different." *Molina-Martinez* v. *United States*, 578 U.S. 189, 200 (2016).

Contrary to the government's position, we refuse to assume on appeal that the district court would necessarily impose a variance of any particular kind. *See Walker*, 74 F.4th at 1203 (stating courts at sentencing "can and should engage in a holistic inquiry of the § 3553(a) factors" (internal quotation marks omitted)); *United States* v. *Henry*, 852 F.3d 1204, 1209 n.3 (10th Cir. 2017) ("When it comes to the loss of liberty, it is better to know

29

on remand than guess on appeal."). In any event, speculation does not carry the government's burden. *See United States* v. *Labastida-Segura*, 396 F.3d 1140, 1143 (10th Cir. 2005) (rejecting the government's harmless-error argument for placing the court of appeals "in the zone of speculation and conjecture" and concluding "we simply do not know what the district court would have done" had it applied the Guidelines correctly).

Because we have found procedural error and the government fails to show harmlessness, we must vacate Mr. Smith's sentencing package and remand for resentencing.[13] *See* 28 U.S.C. § 2106; *Clements*, 86 F.3d at 600–01 (explaining § 2106 "vests courts of appeals with the supervisory power to vacate and remand an entire sentencing package despite the fact that it includes an unchallenged sentence"); *United States* v. *Jackson*, 82 F.4th 943, 949 (10th Cir. 2023) ("[T]he court has discretion to consider the entire sentencing package on remand.").

## IV

The Smiths next argue the district court erred by refusing to consider their objection to the jury instruction on aiding and abetting. The district court construed the Smiths' "objection" as an untimely motion to dismiss

---

[13] Neither party addresses whether resentencing should be limited to the existing record. We leave it to the district court's discretion on remand.

and denied the motion, concluding the Smiths had failed to show "good cause" under Federal Rule of Criminal Procedure 12. We discern no error.

## A

### 1

"[A] party's failure to properly characterize the relief it seeks does not control our review." *Home Loan Inv. Co.* v. *St. Paul Mercury Ins. Co.*, 827 F.3d 1256, 1270 n.12 (10th Cir. 2016). Thus, "we look beyond the form of the motion to the substance of the relief requested." *Id.* (internal quotation marks omitted); *Dodson Int'l Parts, Inc.* v. *Williams Int'l Co. LLC*, 12 F.4th 1212, 1229 (10th Cir. 2021) (explaining a motion gets judged by "its substance rather than according to its form or label" (quoting 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1286 (3d ed. 2004))).

Under Rule 12, a motion alleging "a defect in the indictment . . . must be raised by pretrial motion if the basis for the motion is then reasonably available, and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B). Rule 12 "provides only one circumstance in which an untimely motion can be considered—when the movant 'shows good cause.'" *United States* v. *Bowline*, 917 F.3d 1227, 1230 (10th Cir. 2019) (quoting Fed. R. Crim. P. 12(c)(3)). If the movant fails to show good cause, "we cannot review [the] untimely motion," even under plain-error review. *Id.* at 1229, 1237.

31

**2**

Recall, the indictment charged Mr. Smith as a principal with one count of child abuse in Indian country in violation of Oklahoma law, tit. 21, § 843.5(A); and one count of child neglect in Indian country in violation of Oklahoma law, tit. 21, § 843.5(C). Because Mr. Smith is Indian and his offenses occurred in Indian country, the federal government had authority to punish both crimes via the Major Crimes Act, 18 U.S.C. § 1153.[14] The same indictment charged Mrs. Smith as a principal with one count of child abuse in Indian country under Oklahoma law, tit. 21, § 843.5(A), and one count of child neglect in Indian country under Oklahoma law, tit. 21, § 843.5(C). Because Mrs. Smith is not Indian, her victim is Indian, and her

---

[14] Subsection (a) of the MCA states, "Any Indian who commits against the person or property of another Indian or other person . . . felony child abuse or neglect . . . within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States." 18 U.S.C. § 1153(a). Per subsection (b), "Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense." 18 U.S.C. § 1153(b). Federal law does not define child abuse. So under the MCA, courts look to state law— here, Oklahoma—to "define[] and punish[]" the offense of child abuse by an Indian in Indian country. 18 U.S.C. § 1153; *United States* v. *Other Medicine*, 596 F.3d 677, 681 (9th Cir. 2010) ("Without a federal law defining and punishing felony child abuse, the government may look to applicable state law to define the crime.").

offenses occurred in Indian country, the federal government had authority to punish both crimes via the federal Assimilative Crimes Act, 18 U.S.C. § 13, applied to Indian country via the General Crimes Act, 18 U.S.C. § 1152.

The indictment also alleged the Smiths aided and abetted one another. Counts 1 and 2 (which charged Mr. Smith as a principal) alleged Mrs. Smith "aided and abetted" her husband in the commission of child abuse and neglect. RI.160–61. Likewise, Counts 3 and 4 (which charged Mrs. Smith as a principal) alleged Mr. Smith "aided and abetted" his wife in the commission of child abuse and neglect. RI.162–63.

Before trial, the Smiths did not press a challenge to the operative indictments' allegations they aided and abetted one another. Before the jury instruction conference, near the end of trial, the government proposed a jury instruction on aiding and abetting.[15] Mrs. Smith filed an "objection" to

---

[15] The proposed instruction read, in part,

The defendant can be found guilty of [aiding and abetting, under 18 U.S.C. § 2] only if all the following facts are proved beyond a reasonable doubt:

First: Every element of a charged crime . . . was committed by someone other than the defendant; and

Second: The defendant intentionally associated himself/herself in some way with the crime and

the government's proposed instruction and to any jury instruction claiming she could be found guilty of "aiding and abetting" her husband's crimes under the MCA. RI.498. She pointed out the MCA applies to "[a]ny *Indian who commits*" certain enumerated offenses. 18 U.S.C. § 1153 (emphasis added). Mrs. Smith argued, as a non-Indian, she cannot be charged under the MCA as a principal, and so she necessarily cannot be charged under the MCA as an aider or abettor. Mrs. Smith did not propose a different instruction. Rather, she urged the court not to give any aiding-and-abetting instruction and requested to "be dismissed from this indictment in whole." RI.499. Mr. Smith joined that objection in full, relying on Federal Rule of Criminal Procedure 12(b), which concerns "pretrial motions." *See* RI.508.

---

> intentionally participated in it as he/she would in something he/she wished to bring about.

> This means that the government must prove that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him. The defendant need not perform the underlying criminal act, be present when it is performed, or be aware of the details of its commission to be guilty of aiding and abetting. But a general suspicion that an unlawful act may occur or that something criminal is happening is not enough.

RI.392. This instruction was modeled on the Tenth Circuit pattern instruction. *See* 10th Cir. Pattern Crim. Jury Instruction 2.06. The jury was ultimately given a nearly identical version of this instruction. *See* RI.561.

34

The district court construed the motion as "a late-filed motion to dismiss" and denied it. RI.1341. The jury was instructed on aiding and abetting.

## B

On appeal, the Smiths urge reversal, reprising arguments pressed at the district court.[16] We discern no reversible error, for several reasons.

*First,* the district court did not err in construing the Smiths' "objection" to the aiding-and-abetting instruction as a motion to dismiss.[17] To be sure, the motion was filed while the parties conferred over jury

---

[16] In his separate opening brief, Mr. Smith did not present an aiding-and-abetting argument. But in his Notice of Joinder, Mr. Smith explained, "the logic of [Mr. Smith's] argument extends in the reverse as well. If Mrs. Smith is successful in her argument, it would also be the case that the jury should not have been instructed that Mr. Smith could aid and abet Mrs. Smith under the General Crimes Act and the Assimilative Crimes Act." Dkt. No. 65 at 2. Mr. Smith frames his aiding-and-abetting-challenge as contingent on the success of Mrs. Smith's challenge: "*If* this Court rules in Mrs. Smith's favor with respect to her claim regarding aiding and abetting liability, *then* it should extend that favorable ruling to Mr. Smith." J.S. Reply Br. at 18 (emphasis added); *see also id.* at 19 (arguing the government cannot prove harmless error "*if* Mrs. Smith prevails") (emphasis added).

[17] Our precedent does not resolve the standard of review for a district court's construction of a motion. In general, "issues involving what can broadly be labeled 'supervision of litigation'" receive "abuse-of-discretion review." *Pierce* v. *Underwood,* 487 U.S. 552, 558 n.1 (1988); *cf. Brokers' Choice of Am., Inc.* v. *NBC Universal, Inc.,* 861 F.3d 1081, 1103 (10th Cir. 2017) (abuse-of-discretion review of a district court's refusal to convert a motion to dismiss into a motion for summary judgment). In any event, we need not decide the standard for review today because we conclude the district court did not err.

instructions. But "[t]he substance of the motion, not its form or label, controls its disposition." *United States* v. *Amado*, 841 F.3d 867, 871 (10th Cir. 2016); *see Conrad* v. *Phone Directories Co., Inc.*, 585 F.3d 1376, 1385 (10th Cir. 2009) ("[T]he court must look beyond the caption to the essential attributes of the motion itself."). The Smiths asked to "be dismissed from this indictment in whole." RI.500. That is not a jury-instruction challenge.

*Second*, having properly understood the "objection" as a motion to dismiss, the district court did not err in finding the motion untimely. Rule 12 requires any "defect in the indictment" or "failure to state an offense" to be alleged before trial. Fed. R. Crim. P. 12(b)(3). The Smiths failed to challenge the indictment before trial.[18] Only near the end of trial did the Smiths suggest there was any problem with the aiding-and-abetting allegations in the indictment. Rule 12 provides one exception for untimeliness: "good cause." But Mrs. Smith did not argue good cause in the district court and fails to do so on appeal. Under these circumstances, we

---

[18] Before the grand jury returned a superseding indictment, Mrs. Smith moved to dismiss her original indictment, arguing in part that she could not be charged as an aider or abettor. The district court denied that motion as moot in light of the superseding indictment, and Mrs. Smith never challenged that ruling or the superseding indictment. For purposes of this appeal, therefore, only Mrs. Smith's post-trial "motion to dismiss" is at issue. No party suggests otherwise.

cannot review the untimely motion, even for plain error. *See Bowline*, 917 F.3d at 1229, 1237; *United States* v. *Schneider*, 594 F.3d 1219, 1228 n.9 (10th Cir. 2010) (finding an untimely challenge to an indictment waived under Rule 12 for failure to raise before trial).

Mr. Smith insists we should review the untimely motion to dismiss on the merits. Even if he "failed to timely or properly raise" an issue of law at the district court, he contends, "it is preserved for appellate review" because the district court *sua sponte* raised and resolved that issue on the merits. J.S. Reply Br. at 18–19 (citing *United States* v. *Sweet*, 107 F.4th 944, 956 (10th Cir. 2024)). But this argument was never presented in the opening briefs. Mr. Smith's "argument is entirely new, so the government has not had a chance to respond" and dispute the application of *Sweet* to this issue. *United States* v. *Roark*, 140 F.4th 1280, 1284 (10th Cir. 2025). "As we have repeatedly held, we will not entertain issues raised for the first time on appeal in an appellant's reply brief." *United States* v. *Cortez*, 965 F.3d 827, 833 n.4 (10th Cir. 2020) (internal quotation marks omitted); *see Stump* v. *Gates*, 211 F.3d 527, 533 (10th Cir. 2000) (explaining our waiver rule "protects this court from publishing an erroneous opinion because we did not have the benefit of the appellee's response"). So too here.[19]

---

[19] Even if the Smiths had not waived their argument, and even if the district court erred in recharacterizing their "objection" as an untimely

37

We affirm the district court's decision to construe Mrs. Smith's "objection" to the aiding-and-abetting instruction as a "late-filed motion to dismiss" and, on that basis, decline to consider it.

## V

We next consider Mrs. Smith's argument the district court erred in refusing to dismiss her indictment on jurisdictional grounds. According to Mrs. Smith, the federal courts lack jurisdiction to prosecute her after *Oklahoma* v. *Castro-Huerta*, 597 U.S. 629 (2022).[20] The district court disagreed. Reviewing *de novo*, so do we.

---

motion to dismiss, we would endorse the government's argument that any error in the jury instructions was harmless. "A guilty verdict following an erroneous instruction will be upheld if it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States* v. *Rainford*, 161 F.4th 648, 666 (10th Cir. 2025) (internal quotation marks omitted). In applying this rule, "we must determine whether the guilty verdict actually rendered in *this* trial was surely unattributable to the alleged error[.]" *United States* v. *Kahn*, 58 F.4th 1308, 1318 (10th Cir. 2023) (internal quotation marks and brackets omitted).

Recall, the indictment listed Mr. Smith as a principal in Counts 1 and 2 and Mrs. Smith as a principal in Counts 3 and 4. The verdict form allowed the jury to adjudicate guilt only for the counts listing each Smith as a principal, not as an aider or abettor. We conclude the structure of the verdict form means the guilty verdict was surely unattributable to any instructional error, "eliminat[ing] any possibility" the Smiths were convicted of aiding and abetting. *United States* v. *Holder*, 135 F.4th 887, 902 (10th Cir. 2025), *cert. denied*, 146 S. Ct. 223 (2025).

[20] Mrs. Smith uses "jurisdiction" in the *subject-matter* sense, since she argues the federal courts lack authority to adjudicate her case. *See United States* v. *Hopson*, 150 F.4th 1290, 1296 (10th Cir. 2025).

38

## A

To set up our analysis, we first describe the appellate arguments. Mrs. Smith insists the federal court lacks jurisdiction to prosecute her under the Assimilative Crimes Act, 18 U.S.C. § 13, and the General Crimes Act, 18 U.S.C. § 1152, after the Supreme Court's decision in *Castro-Huerta*.[21] There, the Court held "the Federal Government and the State have concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country." *Castro-Huerta*, 597 U.S. at 633. Mrs. Smith argues *Castro-Huerta*'s holding of "concurrent jurisdiction" means the federal government lacks "sole and exclusive jurisdiction" required to prosecute non-Indian defendants under the GCA. A.S. Op. Br. at 11–13 (quoting 18 U.S.C. § 1152). Similarly, she contends her crime occurred "not within the jurisdiction of any State," meaning the federal government cannot prosecute her under the ACA. A.S. Op. Br. at 11–13 (emphasis omitted) (quoting 18 U.S.C. § 13(a)). Mrs. Smith urges us to read *Castro-*

---

[21] The ACA governs federal enclaves. It states, in relevant part, anyone on a federal enclave "guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed . . . within the jurisdiction of the State" where the federal enclave exists "shall be guilty of a like offense and subject to a like punishment." 18 U.S.C. § 13(a). The GCA states, in relevant part, "the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States . . . shall extend to the Indian country." 18 U.S.C. § 1152.

*Huerta*'s express assertions of federal jurisdiction as dicta. "The Court's focus in *Castro-Huerta* was upon the State's interest," she argues, "and not an analysis of the plain and unambiguous reading of statutory language" of the GCA. A.S. Reply Br. at 2.

The government responds federal courts continue to have jurisdiction to prosecute non-Indians after *Castro-Huerta,* and Mrs. Smith's arguments to the contrary proceed from a misreading of the statutes. The government explains the GCA merely applies the ACA's federal enclave law to Indian country. In the government's view, Mrs. Smith misconstrues the Supreme Court's express recognition of "concurrent" state and federal jurisdiction as instead having "stripped federal courts of jurisdiction[.]" A.S. Resp. Br. at 37.

As we will explain, Mrs. Smith's jurisdictional arguments lack merit.

**B**

The plain texts of the General Crimes Act and the Assimilative Crimes Act allow the federal government to prosecute criminal offenses by a non-Indian against an Indian victim in Indian country. Nothing in federal law or *Castro-Huerta* counsels otherwise. To explain why, we first provide some historical context and then address Mrs. Smith's arguments.

40

**1**

Federal law has long recognized federal enclaves. Statutes from early America defined federal enclaves as places within "the sole and exclusive jurisdiction" of the United States. *E.g.*, Federal Crimes Act of 1790, 1 Stat. 112, §§ 3, 6, 7, 13, 16 (1790); Indian Boundaries Act of 1817, 3 Stat. 383, § 1 (1817). Even so, the early republic faced a problem: Federal enclaves "were pretty literally lawless." *United States* v. *Harris*, 10 F.4th 1005, 1010 (10th Cir. 2021) (internal quotation marks omitted). At that time, "federal statutory law punished only a few crimes committed on federal enclaves, such as murder and manslaughter. The federal courts lacked the power to supplement these few statutory crimes through the use of the common law." *Lewis* v. *United States*, 523 U.S. 155, 160 (1998) (internal citation omitted). "Instead of trying to write an exhaustive criminal code for federal enclaves," Congress devised an ingenious solution: "borrow from preexisting state law." *United States* v. *Christie*, 717 F.3d 1156, 1170 (10th Cir. 2013).

The result was the Assimilative Crimes Act, 18 U.S.C. § 13, enacted in 1825 and "today little changed from its original form." *Christie*, 717 F.3d at 1170. "By its terms, the ACA applies only to crimes committed on federal enclaves—areas where states have ceded jurisdiction over land within their borders to Congress, such as military bases, federal facilities, and national parks and forests." *United States* v. *Polk*, 61 F.4th 1277, 1279 n.2 (10th Cir.

41

2023) (internal quotation marks omitted). "The ACA's basic purpose is one of borrowing state law to fill gaps in the federal criminal law that applies on federal enclaves." *Lewis*, 523 U.S. at 160; *see Iowa Tribe of Indians* v. *Kansas*, 787 F.2d. 1434, 1437 n.2 (10th Cir. 1986) (explaining the ACA "incorporates local state law into federal law and applies that law to federal enclaves located within the state").

The ACA applies to crimes on Indian reservations via the General Crimes Act, 18 U.S.C. § 1152, "which extends federal-enclave law to Indian country." *Polk*, 61 F.4th at 1279 n.2. As the Supreme Court has explained, the GCA "simply borrows the body of federal criminal law that applies in federal enclaves and extends it to Indian country." *Castro-Huerta,* 597 U.S. at 640. The ACA thus extends state criminal laws to federal enclaves, and the GCA extends federal-enclave law to Indian country. *See United States* v. *Langford,* 641 F.3d 1195, 1197 (10th Cir. 2011) ("[I]n conjunction, these statutes: (1) assimilate state criminal law into federal law with respect to acts committed in territories of federal jurisdiction; and (2) apply these assimilated state crimes to acts committed in Indian country."); WILLIAM C. CANBY, JR., AMERICAN INDIAN LAW IN A NUTSHELL 193 (8th ed. 2025) ("Thus a violator of the Assimilative Crimes Act is charged with a federal offense

42

and is tried in federal court, but the crime is defined and the sentence prescribed by state law.").[22]

The jurisdictional argument on appeal turns on language in these two statutes—in particular, the phrase "within the sole and exclusive jurisdiction of the United States" in the GCA, 18 U.S.C. § 1152, and the phrase "not within the jurisdiction of any State" in the ACA, *id.* § 13(a). The Supreme Court has interpreted these provisions before.

In *Ex parte Wilson*, the Court considered a habeas petition from a man convicted in the territory of Arizona for a murder committed in the White Mountain Indian Reservation. *See* 140 U.S. 575, 575–76 (1891). The petitioner, a non-Indian, argued the federal government lacked jurisdiction to prosecute him. He relied on the GCA's predecessor statute, U.S. Rev. Stat. § 2145, which similarly "extend[ed] to the Indian country the general laws of the United States as to the punishment of crimes committed in any place *within the sole and exclusive jurisdiction* of the United States." *Id.*

---

[22] The text of the GCA allows the federal government to apply the "general laws of the United States" to Indian country. 18 U.S.C. § 1152. The Supreme Court and courts of appeals have long said or assumed the ACA is one such "general law." *See, e.g.*, *Williams* v. *United States*, 327 U.S. 711, 713, and n.3 (1946); *Langford*, 641 F.3d at 1197; *United States* v. *Smith*, 925 F.3d 410, 418 (9th Cir. 2019) ("The ACA, as a federal enclave law, thus also applies to Indian country by operation of the [GCA]."). Mrs. Smith does not argue otherwise.

at 578 (emphasis added). Like Mrs. Smith, the petitioner read the phrase "sole and exclusive jurisdiction" to create a requirement for exclusive federal jurisdiction. He pointed out that, in 1885, Congress passed a law granting jurisdiction over murder prosecutions to territory courts, which for sovereignty purposes were distinct from the federal courts. *See id.* at 576–77 (citing *Ex parte Gon-shay-ee*, 130 U.S. 343, 349 (1889) (citing 23 Stat. 385 (Mar. 3, 1885))). The petitioner argued, after enactment of the 1885 law, the territory and federal courts shared jurisdiction, meaning the federal government no longer had "sole and exclusive jurisdiction." *Id.* at 577. Thus, the petitioner claimed, the federal government could not use § 2145 to prosecute him.

The Supreme Court rejected the argument. "The words 'sole and exclusive,' in section 2145 do not apply to the jurisdiction extended over the Indian country," the Court explained, "but are only used in the description of the laws which are extended to it." *Id.* at 578. The Supreme Court pointed out a flaw in petitioner's argument: The text of "the section immediately succeeding" § 2145 stated the statute did not "extend to crimes committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe." *Id.* These provisions made clear that tribes had sovereignty to punish some crimes in Indian country—meaning the

44

federal government lacked sole and exclusive jurisdiction over Indian country. As the Court recognized, the text of § 2145 acknowledged the federal government had only "limited jurisdiction" in Indian country. *Id.*

The Supreme Court reaffirmed its reading of "sole and exclusive jurisdiction" two decades later. In *Donnelly* v. *United States*, the Court explained "the words 'sole and exclusive jurisdiction,' as employed in [the GCA] do not mean that the United States must have sole and exclusive jurisdiction over the Indian country in order that that section may apply to it; the words are used in order to describe the laws of the United States, which, by that section, are extended to the Indian country." 228 U.S. 243, 268 (1913). In the intervening century, courts have repeatedly confirmed that the GCA's use of "sole and exclusive jurisdiction" does not create a requirement for exclusive federal jurisdiction. Instead, the phrase refers to the federal enclave laws that apply to Indian country. *See, e.g.*, *Tooisgah* v. *United States*, 186 F.2d 93, 96 (10th Cir. 1950) (reading the GCA's predecessor statute to mean "the general laws of the United States as to the punishment of crimes committed any place within the sole and exclusive jurisdiction of the United States w[ere] extended to 'Indian Country'"); *United States* v. *White*, 508 F.2d 453, 454 (8th Cir. 1974) ("18 U.S.C. 1152 is not a predicate for general federal criminal jurisdiction in Indian country.

Rather the scope of section 1152 is limited to the applicability or nonapplicability of federal enclave laws[.]").

As to the ACA, the Supreme Court has held the statute allows the federal government to prosecute crimes in Indian country. *See, e.g.*, *Williams* v. *United States*, 327 U.S. 711, 713 (1946); *Denezpi* v. *United States*, 596 U.S. 591, 599 n.2 (2022); *see also United States* v. *Jones*, 921 F.3d 932, 935 (10th Cir. 2019) (summarizing the ACA jurisprudence). And the ACA permits federal prosecutions even where the state has jurisdiction over the same land. As the Court recognized in *Williams*, a state "may have jurisdiction over offenses committed on [a] reservation between persons who are not Indians[.]" *Williams*, 327 U.S. at 714. Still, that does not extinguish federal jurisdiction: "[T]he laws and courts of the United States . . . have jurisdiction over offenses committed there [on the reservation], as in this case, by one who is not an Indian against one who is an Indian." *Id.*

**2**

With those principles and history in mind, we now consider Mrs. Smith's arguments. In her reading, the GCA and ACA require exclusive federal jurisdiction. Because the federal government does not have "sole and exclusive jurisdiction" over Indian country, she says, then the federal government cannot prosecute her under the GCA. And because

46

her crime occurred "within the jurisdiction of any State," she insists, the federal government lacks authority to prosecute her under the ACA.

Mrs. Smith misreads the GCA and ACA, and we resolve her arguments on the plain texts of the statutes.

We begin with the GCA. By its terms, the GCA does not apply when an Indian defendant "has been punished by the local law of the tribe" or when, "by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes[.]" 18 U.S.C. § 1152. Like its predecessor statute § 2145, the GCA recognizes that tribes retain "jurisdiction" to punish some crimes in Indian country—meaning the federal government lacks sole and exclusive jurisdiction over Indian country. *Id.* Mrs. Smith does not explain how, under her reading, the GCA simultaneously requires *exclusive* federal jurisdiction yet also recognizes *non-exclusive* federal jurisdiction. We decline to adopt a statutory construction that "needlessly produces a contradiction in the statutory text." *Shapiro* v. *McManus*, 577 U.S. 39, 43 (2015). Rather, we construe a statute "in a manner that gives effect to all of [its] provisions." *United States ex rel. Eisenstein* v. *City of New York*, 556 U.S. 928, 933 (2009); *see* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 63 (2012) (discussing the "presumption against ineffectiveness," which "ensures that a text's manifest purpose is furthered, not hindered").

47

More than a century of precedent supports our conclusion. Mrs. Smith's argument is a near-exact reprisal of the losing argument in *Ex parte Wilson*: federal "jurisdiction of the offense in the particular place [Indian country] must be 'sole and exclusive,' or will not exist at all[.]" 140 U.S. at 577. The Court rejected the argument there and again in *Donnelly*. *See id.* at 578; *Donnelly*, 228 U.S. at 268. The Court confirmed this reading of "sole and exclusive jurisdiction" again in *Castro-Huerta*. There, the Court explained the GCA "simply borrows the body of federal criminal law that applies in federal enclaves and extends it to Indian country." *Castro-Huerta*, 597 U.S. at 640; *see also Lewis*, 523 U.S. at 160 (explaining the history and purposes of federal enclave law and § 13); *Christie*, 717 F.3d at 1170 (similar). And so the phrase "'sole and exclusive jurisdiction' . . . is 'only used in the description of the laws which are extended' to Indian country, not 'to the jurisdiction extended over the Indian country.'" *Castro-Huerta*, 597 U.S. at 640 (quoting *Ex parte Wilson*, 140 U.S. at 578); *see* CANBY, JR., AMERICAN INDIAN LAW IN A NUTSHELL at 221 (reading *Castro-Huerta* to have "rejected arguments that the [GCA]'s importation of federal enclave law into Indian Country required federal exclusivity"). The GCA "does not purport to equate Indian country and federal enclaves for jurisdictional purposes." *Castro-Huerta*, 597 U.S.

48

at 640; *see also United States* v. *Cowboy*, 694 F.2d 1228, 1234 (10th Cir. 1982) ("Indian country is distinct from federal enclave lands.").

The upshot is the GCA does not require the federal government to have "sole and exclusive jurisdiction" over Indian country to prosecute offenses committed there by non-Indians. The GCA's reference to "sole and exclusive jurisdiction" merely recites a long-accepted definition of federal enclaves in order to "extend" the laws governing federal enclaves to Indian country. 18 U.S.C. § 1152; *see United States* v. *Smith*, 925 F.3d 410, 417 (9th Cir. 2019) (explaining the history and evolution of the phrase "within the sole and exclusive jurisdiction" as used in federal enclave law and federal Indian law); *Williams*, 327 U.S. at 719–20 (recognizing "sole and exclusive jurisdiction" as a definition of federal enclaves from the Federal Crimes Act of 1790).

Mrs. Smith's arguments under the ACA are no better. Her construction of the phrase "not within the jurisdiction of any State" must be rejected on the statutory text alone. The ACA applies either to "[1] places now existing or hereafter reserved or acquired as provided in section 7 of this title, or [2] on, above, or below any portion of the territorial sea of the United States not within the jurisdiction of any State[.]" 18 U.S.C. § 13(a). We presume that, by using the disjunctive word "or," "Congress intended exclusive alternatives." *Foutz* v. *United States*, 72 F.3d 802, 805 (10th Cir.

49

1995). The ACA thus provides two alternative ways for the federal government to assimilate crimes. The language relied on by Mrs. Smith refers to the *second* way: if the crime occurred "on, above, or below any portion of the territorial sea of the United States not within the jurisdiction of any State[.]" 18 U.S.C. § 13(a). We agree with the district court that the most natural reading of the phrase "not within the jurisdiction of any State" is to modify "territorial sea of the United States." *See* RI.1664–65. This reading follows from ordinary tools of statutory interpretation. *See Barnhart* v. *Thomas*, 540 U.S. 20, 26 (2003) (discussing the "rule of the last antecedent," which instructs that a modifying clause or phrase "should ordinarily be read as modifying only the noun or phrase that it immediately follows"); *United States* v. *Crooks*, 997 F.3d 1273, 1277 (10th Cir. 2021) (explaining the nearest-reasonable-referent canon "presumes a modifier refers to the nearest reasonable referent").

The other way the federal government may assimilate crimes under the ACA is by showing the "place[]" has been "reserved or acquired as provided in section 7 of this title[.]" 18 U.S.C. § 13(a). This reference to 18 U.S.C. § 7 allows the ACA to reach "activities on Indian reservations since such areas are 'reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof.'" *United States* v. *Pino*, 606 F.2d 908, 915 (10th Cir. 1979) (quoting 18 U.S.C. § 7(3)). This

language confirms the federal government may charge "offenses committed on such reservations," foreclosing Mrs. Smith's argument. *United States* v. *Sharpnack*, 355 U.S. 286, 292 n.8 (1958) (internal quotation marks omitted); *see Williams*, 327 U.S. at 713 (similar).

Finally, we cannot square Mrs. Smith's statutory arguments with what she admits to be the central holding of *Castro-Huerta*: "[T]he Federal Government and the State have concurrent jurisdiction to prosecute crimes committed by non-Indians against Indians in Indian country." *Castro-Huerta*, 597 U.S. at 633. In her reading, *Castro-Huerta* means the federal courts "no longer have jurisdiction over [n]on-Indian defendants." A.S. Op. Br. at 10 (bolding omitted). But Mrs. Smith does not explain why we should read the Supreme Court's express holding of "*concurrent* jurisdiction" as, instead, a holding of *non*-concurrent jurisdiction. As the government aptly observes, Mrs. Smith's argument would "turn *Castro-Huerta* on its head." A.S. Resp. Br. at 37.

We discern no error in the district court's refusal to dismiss for lack of subject-matter jurisdiction.

## VI

We next turn to Mrs. Smith's argument the district court erred in denying her motion for acquittal and new trial.[23]

## A

At the district court, Mrs. Smith argued "intervening case law" required a post-trial judgment of acquittal on her two counts of conviction (under Federal Rule of Criminal Procedure 29), or in the alternative, a new trial (under Rule 33). RI.1718. In support, she pointed to *United States* v. *Shell*, No. 23-5086, 2024 WL 3455033 (10th Cir. July 18, 2024) (unpublished) (per curiam). There, the defendant was charged with one count of child abuse in Indian country in violation of tit. 21, § 843.5(A) as applied to Indian country via the ACA, 18 U.S.C. § 13. The defendant moved to dismiss the indictment, arguing Oklahoma's child abuse statute cannot be assimilated under federal law. The district court denied the motion, but a panel of this court agreed with the defendant and reversed. *See Shell*, 2024 WL 3455033, at *1. In Mrs. Smith's motion for acquittal or new trial, she said the "statute at issue in the *Shell* matter is the same statute that is now at issue" in her case. RI.1720. "The Tenth Circuit's unpublished

---

[23] Mrs. Smith filed an initial second motion on July 24, 2024. The next day, she filed an amended second motion. The district court deemed the initial motion moot and ruled only on the amended motion.

decision found the Oklahoma statute is improper to use for such federal prosecution," she explained. RI.1720. And, in her view, *Shell* undermined "the validity of the convictions." RI.1721.

Mrs. Smith seemed to recognize her motion was untimely under Rules 29 and 33, which generally require a defendant file within 14 days for their respective relief. *See* Fed. R. Crim. P. 29(c)(1), 33(b)(2). To salvage her motion, she relied on Rule 45, which allows a court to extend filing time if the moving party shows "good cause" and "excusable neglect."[24] Fed. R. Crim. P. 45(b)(1)(B). Mrs. Smith insisted she could show excusable neglect because *Shell* was issued after her trial and sentencing. RI.1725–26. She did not advance a "good cause" argument.

The district court denied the motion. "*Shell* is not binding [authority]," the court explained, and the "underlying arguments" it resolved "were available to [Mrs. Smith] when she filed her first round of

---

[24] Our precedent is inconsistent as to whether Rule 45 requires good cause *and* excusable neglect. Rule 45 mentions both. *See* Fed. R. Crim. P. 45(b)(1)(B). And precedent suggests the standards are different: "'good cause' requires a greater showing than 'excusable neglect.'" *In re Kirkland*, 86 F.3d 172, 175 (10th Cir. 1996). Our cases involving Rule 45 often turn only on "excusable neglect" and often fail to mention "good cause" at all. *E.g.*, *Alva* v. *Teen Help*, 469 F.3d 946, 954 (10th Cir. 2006); *United States* v. *Eastteam*, 426 F.3d 1301, 1303 n.2 (10th Cir. 2005). In any case, Mrs. Smith cannot meet the lower showing of "excusable neglect," so her timeliness arguments fail.

motions." RI.1754. Accordingly, the district court found Mrs. Smith had failed to show excusable neglect. And a new trial under Rule 33 "would not seem to give her the relief she is really asking for," the district court noted. RI.1754 n.3. "Defendant is not saying that there was some evidentiary error in the trial. Rather, she is saying she cannot be prosecuted in federal court under Oklahoma's child abuse statute." RI.1754 n.3.

We discern no error. Mrs. Smith's motion for acquittal and new trial was untimely under Rules 29 and 33, as she acknowledges. And she failed to show excusable neglect under Rule 45 for the reasons stated by the district court.

## B

"We review de novo a district court's decision to deny a defendant's motion for acquittal under Rule 29." *United States* v. *Murphy*, 100 F.4th 1184, 1195 (10th Cir. 2024). "We must view the evidence, both direct and circumstantial, in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, determine whether that evidence, if believed, would establish each element of the crime." *United States* v. *Woodmore*, 127 F.4th 193, 219 (10th Cir. 2025) (internal quotation marks omitted). "Our review is very deferential; we will not overturn a jury's verdict unless no reasonable juror could have concluded, on the basis of the evidence presented, that the defendant was

guilty of the crime charged." *Id.* (internal quotation marks omitted). "We review the district court's denial of a Rule 33 motion for abuse of discretion, reversing only if the court made a clear error of judgment or exceeded the bounds of permissible choice under the circumstances." *United States* v. *Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015).

On appeal, Mrs. Smith does not contest that her motion was untimely. Nor could she. Under Rule 29, a "defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). Under Rule 33, a "motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2).[25] Here, Mrs. Smith's 14-day deadline would have been July 7, 2023. *See* RI.593, 1361 (showing

---

[25] The government acknowledges several times Mrs. Smith moved for a new trial (under Rule 33) *and* for a judgment of acquittal (under Rule 29). Yet neither party meaningfully distinguishes between the two requests for relief. The government does not argue at all why the district court properly denied Mrs. Smith's Rule 29 motion; it argues only why the district court properly denied Mrs. Smith's Rule 33 motion. The most important difference between the two motions is the standard of review: We review a Rule 29 motion *de novo*, *Woodmore*, 127 F.4th at 219, and a Rule 33 motion for abuse of discretion, *Dewberry*, 790 F.3d at 1028. But the standard of review does not matter in this case, because the district court did not err under either standard.

verdict date of June 23, 2023). Mrs. Smith did not file her motion until July 25, 2024, making it untimely by more than one year.

Still, Mrs. Smith insists the late filing should be excused under Rule 45. That rule provides "[w]hen an act must or may be done within a specified period, the court on its own may extend the time, or for good cause may do so on a party's motion made . . . after the time expires if the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(1). Determining whether a party's neglect is excusable "is at bottom an equitable [inquiry], taking account of all relevant circumstances surrounding the party's omission." *Pioneer Inv. Servs. Co.* v. *Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). For example, courts should consider "[1] the danger of prejudice to the [nonmoving party], [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." *Id.*; *see United States* v. *Torres*, 372 F.3d 1159, 1162–63 (10th Cir. 2004) (applying these factors).

Mrs. Smith insists she satisfies the *Pioneer* factors. But her only "excusable neglect" argument seems to be that the unpublished decision in *Shell* is intervening case law and should be "applied in this matter." A.S. Op. Br. at 8; *see also* RI.1725 (arguing *Shell* is a "significant intervening

56

change in the law" and "is a valid reason for delay in filing the post-verdict motions"). We are not persuaded.

Even assuming an intervening change in controlling law can serve as a valid basis for showing excusable neglect,[26] *Shell* did not change the law governing Mrs. Smith's case. *Shell* is an unpublished decision that "supplies only persuasive, not binding, authority[.]" *Lexington Ins. Co.* v. *Precision Drilling Co., L.P.,* 830 F.3d 1219, 1224 (10th Cir. 2016); *see United States* v. *Mink,* 107 F.4th 824, 828 (8th Cir. 2024) (finding no excusable neglect where two cases did not "change the law governing [defendant's] case"). At most, *Shell* shows that one panel of this court endorsed the argument Mrs. Smith now advances—that Oklahoma's child abuse and child neglect statutes cannot be assimilated under 18 U.S.C. § 13. As the government correctly points out, however, "the arguments underlying *Shell* were available to [Mrs. Smith] both before trial, and before she filed her first round of motions." A.S. Resp. Br. at 24. Mrs. Smith acknowledges she had not considered the argument. *See* A.S. Oral Arg. at 1:12–:27 (stating she "didn't foresee that issue"). Ignorance of the law does "not usually constitute

---

[26] Although we have never held that excusable neglect can be shown with a change in controlling law, at least one of our sister circuits has said that "an intervening change in the law can serve as a valid basis for extending the time to file post-trial motions under Rules 29 and 33[.]" *United States* v. *Mink,* 107 F.4th 824, 827 (8th Cir. 2024) (citing *United States* v. *Abu Khatallah,* 316 F. Supp. 3d 207, 210 n.3 (D.D.C. 2018)).

57

'excusable' neglect." *Pioneer*, 507 U.S. at 392; *accord Quigley* v. *Rosenthal*, 427 F.3d 1232, 1238 (10th Cir. 2005).

Mrs. Smith has failed to show "excusable neglect" for her untimely motion, so we do not reach the merits of her argument about *Shell*. And because the district court did not err in denying her untimely motion for acquittal and a new trial, we need not decide whether the errors were harmless.[27]

## VII

Finally, we turn to Mrs. Smith's argument that the district court abused its discretion in allowing certain letters at sentencing. We see no reversible error.

## A

The day before the Smiths' sentencing, the government submitted to the district court four "victim-impact statements" from Allison Smith, Mrs. Smith's daughter and H.M.'s cousin; child-victim H.M.; the Oklahoma social services worker who responded to the scene the day H.M. escaped;

---

[27] Mrs. Smith also argues *Shell* undermines her other count of conviction—child neglect—because Oklahoma's child-neglect statute "would also appear to be encompassed under the federal 'simple assault'" statute. A.S. Op. Br. at 8 (citing 18 U.S.C. § 113(6)). Because we conclude the district court properly denied Mrs. Smith's motion for acquittal and a new trial due to untimeliness, we express no opinion on the merits of her arguments that child neglect cannot be assimilated.

and the then-deputy sheriff who also responded to the scene. The latter two letters detailed lasting trauma from responding to the crime scene.

Just hours ahead of sentencing, Mrs. Smith objected to these letters. She argued the letters from Allison Smith, the state social worker, and the former deputy sheriff should not be introduced at sentencing because their authors were not "victims" under 18 U.S.C. § 3771. Mrs. Smith claimed these letters were "either false, grossly misleading, or contain[] 'new evidence' that was not disclosed at trial." RII.549. She further challenged the "last minute submission" of all four letters, contending she lacked time to review them ahead of sentencing and was thus deprived of "both due process and effective assistance of counsel[.]" RII.542. She moved for more time to review or to quash the letters.

The district court denied the motion. "I have accepted letters of support from many individuals as late as the morning of the sentencing in a lot of other cases," the district court explained, "and I believe the law demands I have this information. . . . And I don't have to give it all same weight, but I do have to consider it." Supp.RI.26 (relying on 18 U.S.C. § 3661). Still, the district court "appreciate[d]" Mrs. Smith's argument that the last-minute filings denied her an opportunity to meaningfully review and respond to the statements. Supp.RI.24. "[T]o the extent that the statements that are provided provide new factual allegations, or factual

59

allegations inconsistent with the PSR or trial testimony," the district court promised, "I will disregard them." Supp.RI.26. The district court clarified "[t]he PSR is the statement of facts for the purposes of this sentencing." Supp.RI.26.

## B

We review a district court's statutory interpretation *de novo*. *See Russell* v. *United States*, 551 F.3d 1174, 1178 (10th Cir. 2008). We review the district court's decision to consider information at sentencing for abuse of discretion. *See United States* v. *Martinez*, 610 F.3d 1216, 1223–24 (10th Cir. 2010); *Concepcion* v. *United States*, 597 U.S. 481, 494 (2022) (discussing a district court's "broad discretion to consider all relevant information at an initial sentencing hearing").

## 1

Mrs. Smith first contends the district court erred by allowing the government to introduce letters from Allison Smith, the state social services worker, and the then-deputy sheriff, because these three individuals were not "victims" under federal law. We see no error. Even assuming Mrs. Smith is correct that these individuals did not qualify as victims under federal law, the district court did not abuse its discretion in considering information from them at sentencing.

60

Section 3771 requires the sentencing court to ensure that the "crime victim . . . be reasonably heard at . . . sentencing[.]" 18 U.S.C. § 3771(a)(4); *see also id.* § 3771(b)(1). The statute defines "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense[.]" *Id.* § 3771(e)(2)(A). Section 3661 reads,

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3661. The Supreme Court has explained § 3661 codified the longstanding principle that sentencing courts have broad discretion "to consider the widest possible breadth of information about a defendant [to] 'ensure[] that the punishment will suit not merely the offense but the individual defendant.'" *Pepper,* 562 U.S. at 488 (internal quotation marks omitted) (quoting *Wasman* v. *United States,* 468 U.S. 559, 564 (1984)); *see also United States* v. *Tucker*, 404 U.S. 443, 446 (1972) (describing the information a sentencing judge may consider as "largely unlimited either as to the kind of information he may consider, or the source from which it may come"). Accordingly, "a court has almost unlimited discretion in determining what information it will hear and rely upon in imposing a sentence under the advisory sentencing guidelines." *Martinez*, 610 F.3d at 1226 (internal quotation marks omitted); *see also United States* v. *Watts*,

61

519 U.S. 148, 151 (1997) (per curiam) (explaining § 3661 "codifies the longstanding principle that sentencing courts have broad discretion to consider various kinds of information").

The interplay of these statutes means a district court must take reasonable measures to hear from a "crime victim" at sentencing. But a district court need not exclude a non-victim from being heard at sentencing. To the contrary, § 3661 expressly places "[n]o limitation . . . on the information" the district court may receive and consider at sentencing. 18 U.S.C. § 3661. "In this way, the statute preserves a long tradition, one extending back 'before . . . the American colonies became a nation,' a tradition of affording judges 'discretion in the sources and types of evidence' they may consult at sentencing, subject of course and always to the Constitution's constraints." *United States* v. *Smith*, 756 F.3d 1179, 1182 (10th Cir. 2014) (quoting *Pepper*, 562 U.S. at 488).

In reading §§ 3661 and 3771 together, we join several of our sister circuits that have rejected the argument advanced by Mrs. Smith. *See United States* v. *Smith*, 967 F.3d 198, 215 (2d Cir. 2020) ("But even if Smith is correct that [the individual] did not qualify as a statutory 'victim' of Smith's . . . offense, *see* 18 U.S.C. § 3771(e)(2)(A), Congress has not placed arbitrary limits on what information a district court may consider at sentencing."); *United States* v. *O'Lear*, 90 F.4th 519, 540 (6th Cir. 2024)

62

("Even if the second technician did not qualify as a victim under § 3771(e)(2)(A), therefore, the court could still consider her information when choosing [defendant's] sentence."), *cert. denied*, 144 S. Ct. 2542 (2024); *United States* v. *Straw*, 616 F.3d 737, 741 (8th Cir. 2010) ("Even though 18 U.S.C. § 3771(a) grants a crime victim the right to be heard at public proceedings, the statute does not operate to *exclude* others from being heard at such proceedings.").

Even if we assume Allison Smith, the state social services worker, and the then-deputy sheriff are not "crime victims" under § 3771, the district court still had the discretion at sentencing to consider their letters under § 3661.[28]

**2**

Mrs. Smith next argues her sentencing was "fundamentally unfair" in violation of Federal Rule of Criminal Procedure 32 and the Due Process Clause, because the district court accepted the four late-submitted letters

---

[28] As we have explained, federal law protects the "[r]ights of crime victims" to "be reasonably heard at any public proceeding in the district court involving . . . sentencing." 18 U.S.C. § 3771(a)(4). The parties agree H.M. qualifies as a "crime victim." *See* A.S. Op. Br. at 17 ("There is no dispute that H.M., the named 'victim' in the original and superseding indictments, meets the statutory definition for the purposes of submitting a Victim Impact Statement."). To the extent the sentencing court may have inadvertently also excluded or minimized H.M.'s *bona fide* victim statement, no party raises the issue, so we do not consider it.

and denied her an opportunity to "adequately prepare any response or rebuttal[.]" A.S. Op. Br. at 18–19.

Rule 32 states a court at sentencing "must give to the defendant and an attorney for the government a written summary of—or summarize in camera—any information excluded from the presentence report under Rule 32(d)(3) on which the court will rely in sentencing, and give them a reasonable opportunity to comment on that information[.]" Fed. R. Crim. P. 32(i)(1)(B). Our precedent confirms "fairness" to a defendant might require "he be apprised in detail of the nature of the adverse information on which the court relied in passing sentence." *United States* v. *Alvarado,* 909 F.2d 1443, 1446 (10th Cir. 1990) (quoting *United States* v. *Perri,* 513 F.2d 572, 575 (9th Cir. 1975)).

Here, the letters were submitted on the eve of sentencing. And we agree with Mrs. Smith that she lacked adequate notice about them. But this late filing does not compel reversal under Rule 32 because the district court did not rely on the letters. *See* Supp.RI.16–17, 26 (district court explaining it would not rely on the letters). Nothing in the record suggests the district court did not do what it promised.[29]

---

[29] Notably, each of the individuals who submitted a letter testified at trial and was subject to cross-examination. And, as the government explains, "nothing in the record suggests [Mrs. Smith] was sentenced based

Resisting this conclusion, Mrs. Smith relies on two cases: *United States* v. *Chanthadara*, 230 F.3d 1237 (10th Cir. 2000); and *United States* v. *Curran*, 926 F.2d 59 (1st Cir. 1991). Neither supports her position that the last-minute submission of the victim statements rendered sentencing "fundamentally unfair."

In *Chanthadara*, this court considered whether victim-impact evidence admitted during the penalty phase of a capital case was so inflammatory as to "infect[] the trial" and deny the defendant due process. 230 F.3d at 1273–74. During the penalty phase, the jury heard testimony from the victim's husband and young children, which had ended "in tears." *Id.* at 1274. Then, the jury was allowed to bring into the deliberations room physical evidence including "letters the children had written to their dead mother" and a journal describing one child's loss. *Id.* In rejecting defendant's argument that the evidence was "unduly inflammatory," we concluded the evidence presented was not "so prejudicial as to render the proceeding fundamentally unfair." *Id.*

---

on materially incorrect information." A.S. Resp. Br. at 50. Mrs. Smith points to no evidence suggesting otherwise.

The letters submitted at Mrs. Smith's sentencing are less prejudicial than what this court found fair in *Chanthadara*.[30] We have previously reviewed information comparable to what was stated in the letters here and discerned no error in the district court's reliance on such evidence. *See, e.g.*, *United States* v. *Barrett*, 496 F.3d 1079, 1099 (10th Cir. 2007) (concluding "there was no error" in admitting victim-impact testimony from several family members, a friend, and a colleague of the decedent because the testimony "was not so unduly prejudicial that it rendered the trial fundamentally unfair in violation of [defendant]'s due process rights" (internal quotation marks and brackets omitted)); *cf. Wilson* v. *Sirmons*, 536 F.3d 1064, 1113 (10th Cir. 2008) (finding no plain error because the evidence in *Chanthadara* was "far more inflammatory" than the testimony from a victim's wife and mother).

Nor does *Curran* advance Mrs. Smith's position. There, the First Circuit vacated a sentence after the sentencing court extensively quoted from a victim letter that the defendant did not know about until the hearing. *See Curran*, 926 F.2d at 60–61. Mrs. Smith reads *Curran* to mean that a sentencing court violates both Rule 32 and the Due Process Clause

---

[30] For purposes of this opinion, we assume without deciding that *Chanthadara* applies outside the context of a penalty phase of a capital case.

when, at sentencing, the court denies the defendant's "right to examine the letters and the opportunity to contradict the relevant statements." A.S. Op. Br. at 18. But *Curran* is distinguishable.[31] The district court there, unlike here, actually relied on the undisclosed letter at sentencing. *Curran*, 926 F.2d at 63 (finding the district court erred by failing to "make clear that the document is not being used for its factual content").

## VIII

We **AFFIRM** the Smiths' convictions, **AFFIRM** Mrs. Smith's sentence, **VACATE** Mr. Smith's sentence, and **REMAND** for resentencing on both counts of conviction consistent with this opinion.

---

[31] Contrary to Mrs. Smith's claims, *Curran* concluded that a failure to disclose a document relied on at sentencing did *not* violate Rule 32 or the Due Process Clause. *See Curran*, 926 F.2d at 61–62. Instead, the First Circuit invoked its "supervisory powers" under 28 U.S.C. § 2106 to find the sentencing court had erred. *Id.* at 62–63. Mrs. Smith does not develop an argument about supervisory powers. Instead, she hinges her challenge to the victim-impact statements on Rule 32 and the Due Process Clause. We cannot consider an argument a party never makes. *See United States* v. *Yelloweagle,* 643 F.3d 1275, 1284 (10th Cir. 2011) ("We cannot make arguments for [a litigant].").